UNITED STATES of America, Appellee,

v.

Kenneth GUARINO,* Defendant,
Appellant.

No. 81–1301.

United States Court of Appeals,
First Circuit.

Reheard Dec. 7, 1983.

Decided Feb. 28, 1984.

Herald Price Fahringer, New York City,
for Kenneth Guarino and Imperial Distributors, Inc.

William E. Seekford, Towson, Md., on
brief for Little Book Shops, Inc., Anthony
DiBona, and Gemini Enterprises, Inc.

John F. Sheehan, Portland, Me., on brief
for Edward Miguel, Gloria Osborne, and
Joseph Renzi, Jr.

Nelson S. Baker, Boston, Mass., on brief
for defendant-appellant.

* This opinion also covers Nos. 81–1302, United
States v. Little Book Shops, Inc.; 81–1303, United
ed States v. Anthony DiBona; 81–1304, United
States v. Gemini Enterprises, Inc. and Imperial
Distributors, Inc.; 81–1307, United States v. Edward Miguel; 81–1308, United States v. Gloria
Osborne; and 81–1309, United States v. Joseph
Renzi, Jr.

Maurice R. Flynn, III, Asst. U.S. Atty., Boston, Mass., with whom William F. Weld, U.S. Atty., and Gary S. Katzmann, Asst. U.S. Atty., Boston, Mass., were on brief, for appellee.

Before CAMPBELL, Chief Judge, ALDRICH, COFFIN, BOWNES and BREYER, Circuit Judges.

BAILEY ALDRICH, Senior Circuit Judge.

Defendants were convicted of transporting obscene matter in interstate commerce for the purpose of sale, 18 U.S.C. § 1465, and for conspiracy, 18 U.S.C. § 371. The convictions were affirmed by a divided panel and subsequently their appeals were heard en banc. We reverse.

On the morning of February 28, 1978, F.B.I. special officer Gilligan presented to a U.S. magistrate his four-page affidavit requesting a warrant authorizing the search for, and seizure of, obscene matter allegedly in a panel truck and presently being transported from defendants' warehouse in Providence, Rhode Island, for delivery to retail stores in Boston's Combat Zone.[1] Accompanying the affidavit were copies of three magazines, entitled Turkish Delight, Sex Foto Fiction No. 1, and Sex Foto Fiction No. 2, hereinafter sometimes the affidavit magazines. The affidavit adequately showed that copies of these magazines, openly traced to defendants' truck, and openly offered for sale at Combat Zone stores, had been there purchased by Boston police officers on various dates between January 17 and February 2, 1978. On the basis of the affidavit and inspection of the magazines the magistrate issued a warrant commanding the seizure of,

"a quantity of obscene materials, including books, pamphlets, magazines, newspapers, films and prints" presently in said truck. Contemporaneously, the magistrate issued an Order, so-called, containing his findings, and concluding with instructions to the officers.[2]

The warrant and the order did not refer to each other. The truck was stopped at some time prior to 11:45 A.M. when a copy of the warrant was served on the driver. Officer Gilligan, who ultimately led the search following the unauthorized arrest of the driver and the taking of the truck and contents to the F.B.I. garage, possessed a copy of the order.

---

1. The Combat Zone has been described as the "adult entertainment district of Boston." *Commonwealth v. Lotten Books, Inc.,* 1981, 12 Mass. App. 625, 428 N.E.2d 145, 147.

2. ORDER

February 28, 1978
COHEN, U.S.M.

Upon review of the affidavit submitted by Special Agent Lawrence Gilligan, this Court has reviewed the magazines Turkish Delight referred to by Special Agent Gilligan, as well as the magazines Sex Photo Fiction No. 1 and Sex Photo Fiction No. 2, also referred to by Special Agent Gilligan. Upon review of those three magazines, this Court concludes that the average person, applying contemporary community standards, would find the magazines taken as a whole, appeal to the prurient interests; that those magazines depict or describe, in a patently offensive way sexual conduct specifically defined by applicable law; and that the magazines, taken as a whole, lack serious literary, artistic, political, or scientific value. In particular, this Court finds that those magazines depict patently offensive representations or descriptions of ultimate sexual acts, normal or pervert, actual or simulated, and that the magazines further depict lewd exhibition of the genitals.

Moreover, on the basis of the affidavit submitted by Special Agent Gilligan, this Court concludes that there is a pattern of delivery of magazines of the same tenor as Turkish Delight, Sex Photo Fiction No. 1, and Sex Photo Fiction No. 2 by Imperial Distributors and/or Kenneth F. Guarino from the State of Rhode Island. On the basis of the foregoing, this Court concludes that the one truck bearing Rhode Island commercial license 91826 is presently in possession of obscene materials, including books, pamphlets, magazines, newspapers, films, and prints of the same tenor and description as Turkish Delight, Sex Photo Fiction No. 1, and Sex Photo Fiction No. 2.

On the basis of the foregoing, Special Agent Lawrence Gilligan of the Federal Bureau of Investigation, and other officers authorized by law, are hereby commanded to search that one truck bearing Rhode Island commercial license 91826 in order to determine whether or not there exists therein obscene materials of the same tenor as Turkish Delight, Sex Photo Fiction No. 1 and Sex Photo Fiction No. 2.

Pausing here, we observe that the warrant language ("obscene materials") was precisely what was condemned in *Marcus v. Search Warrant*, 1961, 367 U.S. 717, 731–32, 81 S.Ct. 1708, 1715–16, 6 L.Ed.2d 1127, as constituting an impermissible general warrant. We are unanimously of the view that in this circumstance the failure at least to attach, or to incorporate the order by reference into the warrant, so that it would read on it, is unsupported by any discovered authority, and a majority of the court tends to believe the omission would have been fatal had the point been pressed below. However, remarks defendant made in the district court were inconsistent with asserting this objection ("[Y]our Honor ... we have an agreement that the agents were acting under the order ....") and since we are confident that the procedure will not occur again, we need not reach a final conclusion as to its validity.[3]

At the garage the officers searched through a large number of cartons,[4] and by afternoon had separated out eight magazines and five films, hereinafter sometimes the warrant items, for inspection, in situ, by the magistrate. After making that examination the magistrate, finding them obscene, issued a second warrant, calling for their seizure, which was done. Motions to suppress were twice denied. *Imperial Distributors, Inc. v. United States*, D.Mass., 1979, 473 F.Supp. 294; Id., D.Mass., 1980, unreported.

■ It will be noted that, perhaps in recognition of their staleness, none of the affidavit magazines was included in the order's directions, but only "materials of the same tenor." It is to be further noted that the single substantive count and the single conspiracy count of the indictment are based upon the warrant items, only. As a consequence, if all of these were wrongly seized, the indictment must fail, and if at least some were improper, *e.g.*,

the films, the verdicts must be set aside, inasmuch as the jury could have convicted by finding any single item obscene. *Cf. Brochu v. Ortho Pharmaceutical Corp.*, 1 Cir., 1981, 642 F.2d 652; *Clark v. Taylor*, 1 Cir., 1983, 710 F.2d 4, 8 n. 2.

There are two basic complaints, which we will consider on the assumption that the order was a valid allonge to the warrant.

*The Warrant*

The Fourth Amendment was a response to the writs of assistance that gave officers of the crown roving powers of intrusion upon person and property. In this connection it would be difficult to find anything more presently apt than the language of the Court in *Stanford v. Texas*, 1965, 379 U.S. 476, at 481–85, 85 S.Ct. 506, at 509–11, 13 L.Ed.2d 431. After quoting the Fourth Amendment, the Court said,

"These words are precise and clear. They reflect the determination of those who wrote the Bill of Rights that the people of this new Nation should forever 'be secure in their persons, houses, papers, and effects' from intrusion and seizure by officers acting under the unbridled authority of a general warrant. Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists. The hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws.

. . . .

"What is significant to note is that this history is largely a history of conflict between the Crown and the press. It was in enforcing the laws licensing the publication of literature and, later, in prosecutions for seditious libel that general warrants were systematically used in the sixteenth, seventeenth, and eigh-

3. We note also the pending case of *Commonwealth v. Sheppard*, 1982, 387 Mass. 488, 441 N.E.2d 725, *cert. granted*, 1983, —— U.S. ——, 103 S.Ct. 3534, 77 L.Ed.2d 1386, that may well cast light on this question.

4. The record indicates 38. How many different items were involved may only be inferred from the fact that the search lasted several hours, with several officers participating.

teenth centuries.... In later years warrants were sometimes more specific in content, but they typically authorized the arrest and search of the premises of all persons connected with the publication of a particular libel, or the arrest and seizure of all the papers of a named person thought to be connected with a libel.

....

"This is the history which prompted the Court less than four years ago to remark that '[t]he use by government of the power of search and seizure as an adjunct to a system for the suppression of objectionable publications is not new.' *Marcus v. Search Warrant*, 367 U.S. 717, at 724 [81 S.Ct. 1708 at 1712, 6 L.Ed.2d 1127]. 'This history was, of course, part of the intellectual matrix within which our own constitutional fabric was shaped. The Bill of Rights was fashioned against the background of knowledge that unrestricted power of search and seizure could also be an instrument for stifling liberty of expression.' *Id.*, at 729 [81 S.Ct. at 1715].

"In short, what this history indispensably teaches is that the constitutional requirement that warrants must particularly describe the 'things to be seized' is to be accorded the most scrupulous exactitude when the 'things' are books, and the basis of their seizure is the ideas which they contain. See *Marcus v. Search Warrant*, 367 U.S. 717 [81 S.Ct. 1708, 6 L.Ed.2d 1127]. *A Quantity of Books v. Kansas*, 378 U.S. 205 [84 S.Ct. 1723, 12 L.Ed.2d 809]. No less a standard could be faithful to First Amendment freedoms.

....

" 'The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the

officer executing the warrant.' *Marron v. United States*, 275 U.S. 192, at 196 [48 S.Ct. 74, at 76, 72 L.Ed. 231]."

■ To tell the officers to seize anything which, in their opinion, meets the omnibus legal definition of obscenity is not *"scrupulous exactitude."* Nor does it become such by adding "of the same tenor" as three named magazines, especially when the sameness is so broadly defined as to include any communicative material, from books to prints to motion pictures. We note particularly *Stanford*'s requirement, *ante*, quoting from *Marron v. United States*, that *"nothing is left to the discretion of the officer."*

Continuing with *Stanford*,[5] 379 U.S. at p. 486, 85 S.Ct. at p. 512,

"We need not decide in the present case whether the description of the things to be seized would have been too generalized to pass constitutional muster, had the things been weapons, narcotics or 'cases of whiskey.' See *Steele v. United States No. 1*, 267 U.S. 498, 504 [45 S.Ct. 414, 416, 69 L.Ed. 757][18] The point is that it was not any contraband of that kind which was ordered to be seized, but literary material—'books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other written instruments concerning the Communist Party of Texas, and the operations of the Communist Party in Texas.' The indiscriminate sweep of that language is constitutionally intolerable. To hold otherwise would be false to the terms of the Fourth Amendment, false to its meaning, and false to its history.

18. [Footnote quoting *Marcus v. Search Warrant*, *ante*, omitted.]"

It is true that *Stanford* was concerned with political literature, and social ideology, but there are no degrees here of First Amendment protection, any more than there are measures of distress or offensiveness, depending on the reader, listener, or

5. In addition to *Stanford* on this aspect, *see Roaden v. Kentucky*, 1973, 413 U.S. 496, at 501– 503, 93 S.Ct. 2796, at 2799–2800, 37 L.Ed.2d 757.

viewer.[6] It was but a step from this to the recent unanimous opinion in *Lo-Ji Sales, Inc. v. New York,* 1979, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920. There a police officer, having openly bought two films from defendant's "adult" bookstore, presented to the town justice the following affidavit.

"While on the premises I observed what I have reasonable cause to believe are the same or similar films. I also observed in the premises other reels of film, magazines and other objects. Based upon my observations, and my conversations with Mr. Mandakis which indicated to me that the films and magazines portrayed *similar activities as described above,* I have reason to believe that this material is being possessed in violation of Article 235 of the Penal Law." (U.S. Supreme Court record, p. 6a.) (Emphasis suppl.)

The Court held this supplied no probable cause for a warrant extending beyond copies of the original films. Correspondingly, the Court put it the other way; a seizing officer's determination of similarity is equally unacceptable.

"Based on the conclusory statement of the police investigator that *other similarly obscene materials* would be found at the store, the warrant left it entirely to the discretion of the officials conducting the search to decide what items were likely obscene and to accomplish their seizure. The Fourth Amendment does not permit such action." 442 U.S., ante, at 325, 99 S.Ct., at 2324. (Emphasis suppl.)

The officer's disability was not based upon ignorance of standards, and hence curable, as our dissenting brothers would have it, by furnishing him specific instructions in terms of the Court's definition of obscenity. The definition in *Miller v. California,* 1973, 413 U.S. 15, 24–25, 93 S.Ct. 2607, 2614–15, 37 L.Ed.2d 419, which they would improperly import, was for use by impartial jurors, under the guidance of the court, and not, as *Lo-Ji* pointed out, for a searching officer, disqualified because he was not "neutral and detached." It may be noted that the actual standard the *Lo-Ji* police officer applied in determining "similar activities," and "similar obscene materials," was even more specific than the one contained in the order here; yet the Court held his affidavit unacceptable.[7]

■ Correspondingly, as a non-neutral and un-detached officer cannot express legal conclusions in an affidavit, he cannot exercise judgment when making seizures. In *Lo-Ji* the town judicial officer, after issuing a warrant for the seizure of the two named films, left the warrant open, and himself repaired to defendant's store, where he viewed more films and magazines and added them to the warrant. Although by training and experience he was, of course, personally qualified, the Court, again voicing the analogy to writs of assistance, invalidated these additions, saying that by participating in the search the town justice cast himself in the character of the police and accordingly was precluded from making such determinations.[8]

6. "[S]exually explicit but non-obscene materials, however distasteful, are entitled to no less protection than other forms of expression." *Fantasy Book Shop, Inc. v. City of Boston,* 1 Cir., 1981, 652 F.2d 1115, 1126.

7. 3. . . . . I observed [the motion picture LINDA AND DUKE] to contain acts of female masturbation and activities involving bestiality in that a female participant in the movie attempted to engage in acts of sexual intercourse with a German Shepard type dog.... Upon viewing [FOUR FOR DINNER] I observed acts of sexual intercourse, sodomy, fellatio, cunnilingus, and masturbation....

4. While in the premises I observed what I have reasonable cause to believe are the same or similar films. I also observed in the premises other reels of films, magazines and other objects. Based upon my observations, and my conversations with Mr. Mandakis [a defendant] which indicated to me that the films and magazines portrayed similar activities as described above, I have reason to believe that this material is being possessed in violation of ...." Supreme Court record, pp. 6a–7a.

8. The Court's restriction, of course, applies only to search and seizure of articles not already voluntarily exposed. *Cf. Heller v. New York,* 1973, 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745

Our dissenting brothers denigrate *Lo-Ji*, and rely upon earlier circuit court decisions that lacked the benefit of its instructions, and a small number of later cases [9] that ignored them. Thus *United States v. Marti*, 2 Cir., 1970, 421 F.2d 1263, a pre-*Lo-Ji* case, is extolled as "not insist[ing] upon *literal* compliance" with *Stanford v. Texas*' denial of discretion to the police, although *Lo-Ji* has made it clear that the Court meant exactly that. Their reliance upon cases involving "instruments of crime" overlooks that in *Stanford v. Texas*, 379 U.S., ante, at 486, 85 S.Ct. at 512, quoted ante, the Court distinguished between "literary material," presumptively protected by the First Amendment, and readily identifiable objects.

■ While our brothers do not adopt the government's repeated assertion, both in the district court and here, that there was but a "limited detention" and no seizure until after the magistrate had viewed the items in situ at the garage, they would have it that it was "considerably more limited than the typical seizure" because of the magistrate's prompt review "that same afternoon." [10] Thus would every seizure under a general warrant be sanitized if the magistrate followed close on the heels of the officers. This is to forget black letter law that "[a]ny idea that a search can be justified by what it turns up was long ago rejected in our constitutional jurisprudence." *Bumper v. North Carolina*, 1968, 391 U.S. 543, 548 n. 10, 88 S.Ct. 1788, 1791 n. 10, 20 L.Ed.2d 797. The government, having identified no forfeitable fish, cannot

cast a net over the whole pond and retain whatever forfeitable fish are discovered, so long as it shortly returns the rest. This is precisely the unbridled expedition that the Fourth Amendment was designed to prevent, and which the Court has repeatedly condemned as peculiarly improper when employed to trespass on First Amendment rights.

Finally, our brothers deplore the difficulties the police would face if they could not conduct themselves as they did here. This seems a peculiarly unnecessary place for police difficulties to be used as an excuse for violating the Fourth Amendment. Unlike drugs, the magazines were openly for sale, and were openly delivered by defendants' trucks. The government already had a case, on the three original magazines, traced by the officers to the defendants. The purchases could be repeated, if there were, in fact, more such magazines. If officers' evidence against the defendants were thought insufficient to persuade a jury, surely the store managers could be put in a position of welcoming immunity to testify. If the government wanted to grandstand, all it needed was to read a handful of Supreme Court opinions, instead of providing work for seven judges. It is noteworthy that there were no First Circuit cases offering contrary advice.

*Probable Cause*

■ The government is equally deficient with respect to the existence of probable cause. It begins by grossly overstating

(judicial officer can properly make decisions when, without needing to wear a police hat, he is viewing a motion picture on public display). Our brothers, in relying on *Heller*, fail to note that the *Lo-Ji* court expressly distinguished *Heller* on that basis. *Lo-Ji Sales*, ante, 442 U.S. at 327–28, and 328 n. 6, 99 S.Ct. at 2324–25, and 2325 n. 6.

**9.** See the dissent's post *Lo-Ji* case, *In the Matter of the Seizure of Property Belonging to Talk of the Town Bookstore, Inc.*, 9 Cir., 1981, 644 F.2d 1317, 1319, where the court characterized the definition in *United States v. Marti*, 2 Cir., 1970, 421 F.2d 1263, 1268, "depicting natural or unnatural sexual acts," as an example of "the most scrupulous exactitude." *Lo-Ji* was not even cit-

ed. In *Sovereign News Co. v. United States*, 6 Cir., 1982, 690 F.2d 569, *cert. denied*, — U.S. ——, 104 S.Ct. 69, 78 L.Ed.2d 83, *Lo-Ji* was cited, but not for this point, and the court made the extraordinary misstatement, at 575–76, "In reviewing this case, we must remember that the Supreme Court [in *Heller*] has specifically stated that the magistrate need not view a film before seizing it." Pornography can have other than erogenous effects.

**10.** Whatever restraint is intended by the word "limited," we note that some two hours before the seizure under the second Boston warrant, the truck items were used to obtain a Rhode Island warrant that was immediately exercised.

the affidavit. It was adequately shown that defendants' trucks had been delivering "magazines, books and newspapers" to various Combat Zone stores since April, 1975. However, until January, 1978, no single item was identified, let alone shown to be obscene.[11] On the general subject of obscenity the affidavit offered, exclusively, the unsupported opinions of two Boston police officers. "[T]he chief business of [Combat Zone] stores is to regularly offer for sale numerous items, including books, magazines, prints and films, which are obscene as matter of law," and to "offer pornographic materials for sale to the public." These conclusions were, of course, worthless. *Lo-Ji Sales, Inc.*, ante; *Roaden v. Kentucky*, ante, 413 U.S. at 502–03, 93 S.Ct. at 2800. It was adequately shown that the stores offered peepshows. The officers viewed films exhibited therein and, "in their opinion, the films have invariably displayed various types of hard core pornography." Again, these opinions are worthless. Nor does the fact that they were Combat Zone peepshows raise a presumption of obscenity. *Fantasy Book Shop, Inc. v. City of Boston*, n. 6, ante.

With regard to defendants' connection with films, the sole showing was that on a single occasion, four months prior to the seizure, one of defendants' truck drivers entered a Combat Zone store and remained there "about 20 minutes and was observed servicing the peep show film machines therein." Other than this, defendants were not shown to have any connection with films. The word "servicing" was not explained. Not until en banc consideration was it suggested that "servicing machines" might mean supplying films, rather than mechanical maintenance which a driver might have done as a private matter. Significantly in this respect, while on all other surveillances the number of cartons carried in was recorded, none was noted then.

With no films traced to defendants' truck on 14 occasions, the likelihood of there being any present on the 15th is far short of probable cause. To say that because the stores sold films, defendants must have been their supplier, is the rankest speculation.

It is true that the magistrate recited films in his order, but it is apparent that he did this as a result of adopting, wholesale, the affidavit's final conclusions, inasmuch as he also included, as being in the truck, pamphlets and prints, although at no time were such documents even remotely traced to defendants. Inspection of the penultimate paragraph of the order makes evident that the entire findings are built on the affidavit magazines, plus acceptance verbatim of the officers' generalizations.

■ While conceding that " 'probable cause' is more difficult," the dissent would write off the difficulties as "technicalities," and turn to "common sense." We believe this quite erroneous. Stripped of unwarranted opinion, all that the affidavit directly supports is that for almost three years defendants had been supplying great quantities of books, magazines and newspapers to stores that sold materials that were sexually explicit. Nothing in the affidavit can support a finding that any matter supplied by defendants or, indeed, sold in the stores throughout the period, was obscene, other than the three affidavit magazines of 4–7 weeks before. Sexually explicit, whatever it may mean to a lay person, does not mean obscene. *Fantasy Book Shop, Inc. v. City of Boston*, ante, n. 6; *cf. Roth v. United States*, 1957, 354 U.S. 476, 487–88, 77 S.Ct. 1304, 1310, 1 L.Ed.2d 1498; *Jacobellis v. Ohio*, 1964, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793. Our brothers concede that the officers' determinations of obscenity were valueless. They contend, however, that since the stores were for "adult entertainment," rather than religious devotions, there must have been more material similar in tenor to the three magazines discovered.

---

11. Compare the magistrate's finding that "there is a pattern of delivery of magazines of the same tenor as [the affidavit magazines.]" Even if the affidavit had said this, which it nowhere did, such statements would have been precisely what *Lo-Ji* rejected.

How in view of the *Lo-Ji* affidavit, n. 7, ante, they distinguish *Lo-Ji*, is not clear.[12]

So far as appears from the affidavit, in nearly three years none of defendants' customers had been prosecuted, and in 14 surveillances, police "who have spent the majority of their working time ... enforcing the Commonwealth of Massachusetts' laws dealing with obscenity," had found only three magazines traceable to defendants thought worthy of presentation to a magistrate. In light of this, we must suspect that our brothers' willingness to wager there were more items of similar character in the next truck could be based only on an assumption that these were, nevertheless, pornography shops and that the police, through incompetence, inefficiency, or perhaps worse, had failed in their duty. This is not an affirmative showing of "probable cause, supported by Oath or affirmation."

Moreover, even with the best of assumptions, we must wonder how much of their patrimony our brothers would have risked on defendants' next truck containing films, when none had ever been seen before. Their contention that films could be included in the order even if initially there was lacking "cause to believe [they] would likely be found," because, "[i]f there were no films on the truck, the inclusion of films in the order would seem harmless," while at the same time saying they could be seized if any were discovered, strikes at the heart of the Fourth Amendment. This would convert the plain view exception to probable cause, based on inadvertent discovery, *Coolidge v. New Hampshire*, 1971, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564, into a means for deliberate circumvention of the requirement. The dissent would thus support a warrant both lacking "probable cause supported by Oath or affirmation," as well as failing to "particularly describ[e] the ... things to be seized."

In short, by a combination of contentions, some of which, however put, disregard Supreme Court decisions, and by using the word "reasonable" in the Fourth Amendment out of context, our brothers would adopt a "flexible approach" to reach a "common sense" result. In addition to the fact that, as to films, there was no probable cause whatever, the inescapable fact is that this case started with a classic general warrant, supplemented by an order directed to, and solely to, items that could only be identified by government agents exercising discretion which, at one point even the dissent concedes, the Court denied them, and which, accordingly, remained a general warrant, in, of all places, an area protected by the First as well as the Fourth amendment. We can only repeat what the unanimous Court said in *Lo-Ji Sales*, ante, 442 U.S. at 329, 99 S.Ct. at 2326,

> "Our society is better able to tolerate the admittedly pornographic business of petitioner than a return to the general warrant era; violations of law must be dealt with within the framework of constitutional guarantees."

Our brothers would forget all this because of the Combat Zone's general reputation, and by inventing a new principle, that "reasonable" repair cures constitutional violations. This is not "common sense" to which we subscribe.

Perhaps because the defendants to whom it might apply were minor characters, the government has not raised any question of lack of standing, and we will not volunteer to do so. Both because the warrant and order were basically defective, and because probable cause was lacking for whatever could be thought intended, the verdicts are set aside, the judgments of conviction are reversed and the causes are remanded to the district court with instructions to dismiss the indictment.

---

12. On the issue of probable cause the *Lo-Ji* affidavit cannot be disregarded, as our brothers suggest, because not "referred to in the warrant," or because the Court did not refer to it in dealing with "particularity." Succinctly, the Court said, 442 U.S. at 325, 99 S.Ct. at 2324,

> "The conclusory statement of the police investigator that other similarly obscene material would be found at the store ... was not sufficient probable cause to pursue a search beyond looking for additional copies of the two specified films."

BREYER, Circuit Judge, with whom Chief Judge CAMPBELL joins (dissenting).

The questions the court here decides arise out of a magistrate's order, which the court, for reasons peculiar to this case, must treat like a warrant. The order concededly authorized the FBI to do the following: (a) stop a truck in the Combat Zone; (b) bring the truck to the nearby FBI garage; (c) look through boxes of material the truck carried, segregating material they considered unlawfully obscene; and (d) hold the segregated material until the magistrate could view it and determine which items could be seized more permanently. The order was issued at 11:05 a.m.; the magistrate's "viewing" took place the same afternoon; the materials segregated by the FBI agents turned out to be hardcore pornography.

The court reverses defendants' convictions for two reasons related to the order. First, it believes that the language of the order violates the fourth amendment's command that warrants "particularly decrib[e] ... the ... things to be seized." Second, it believes that the issuance of the order violated the fourth amendment's command that warrants issue only upon "probable cause." I believe the majority is mistaken on both counts.

## I.

A common-sense reading of the order's language indicates that it authorizes the stop, and search, of the truck to look for

> obscene materials ... of the same tenor and description as Turkish Delight, Sex Photo Fiction No. 1, and Sex Photo Fiction No. 2,

which magazines

> taken as a whole, appeal to the prurient interest; ... and ... taken as a whole, lack serious literary, artistic, political, or scientific value. In particular, ... those magazines depict patently offensive representations or descriptions of ultimate sexual acts, normal or pervert, actual or simulated, and ... further depict lewd exhibition of the genitals.

For several reasons, prior law requires us to find this language specific enough to allow the agents to stop the truck, look through the boxes, and segregate the described material for inspection by the magistrate.

First, it is difficult, if not impossible, given the nature of obscenity and the limitations of language, to write a more specific definition of yet unseen hardcore pornography. See Jacobellis v. Ohio, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring) ("I shall not today attempt further to define the kinds of material I understand to be embraced within [the words 'hard-core pornography'] ... and perhaps I could never succeed in intelligibly doing so. But I know it when I see it ...."). Indeed, the descriptive language in the magistrate's order is drawn directly from the Supreme Court's illustration, in Miller v. California, 413 U.S. 15, 24–25, 93 S.Ct. 2607, 2614–15, 37 L.Ed.2d 419 (1973), of how a state might "specifically define" guidelines for a trier of fact to distinguish unlawfully obscene material from material that the first amendment protects. The majority and dissenters in Miller disagreed about whether it was possible to define unlawful obscenity with sufficient particularity to pass constitutional muster. And in context, the illustrative language borrowed by the magistrate represents the Supreme Court's effort to be as specific as possible. Such language is inevitable if seizures of materials that the magistrate cannot designate by name are ever permissible.

Second, courts of appeals have approved the use of language no more specific than that at issue here, as authorizing searches and seizures considerably more extensive. Thus, in United States v. Cangiano, 491 F.2d 906, 911–14 (2d Cir.) (Cangiano II ), cert. denied, 419 U.S. 904, 95 S.Ct. 188, 42 L.Ed.2d 149 (1974), the Second Circuit upheld "massive" seizures pursuant to a warrant covering

> a quantity of playing cards, films, and magazines and books, depicting obscene and lascivious pictures, constituting hard core pornographic material, which pic-

tures portray men and women in the natural and unnatural sexual acts.

In *In re Property Belonging to Talk of the Town Bookstore, Inc.*, 644 F.2d 1317 (9th Cir.1981), the Ninth Circuit approved a warrant allowing long-term seizure of "books, magazines, and films which depict the specific sex acts described in the Affidavits" as, among others, "ultimate sexual acts, normal and perverted, masturbation, ...." And, in dicta, the Second Circuit has approved language that would authorize seizure of films "depicting natural or unnatural sexual acts." *United States v. Marti*, 421 F.2d 1263, 1268 (2d Cir.1970), *cert. denied*, 404 U.S. 947, 92 S.Ct. 287, 30 L.Ed.2d 264 (1971). Furthermore, in *Sovereign News Co. v. United States*, 690 F.2d 569 (6th Cir.1982), *cert. denied*, —— U.S. ——, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983), *United States v. Gilman*, 684 F.2d 616 (9th Cir.1982), and *G.I. Distributors, Inc. v. Murphy*, 490 F.2d 1167 (2d Cir.1973), *cert. denied*, 416 U.S. 939, 94 S.Ct. 1941, 40 L.Ed.2d 290 (1974), the Second and Ninth Circuits have allowed officers to seize apparently obscene materials without *any* governing standard, provided that the materials were "in plain view" and were held only briefly, pending issuance of a warrant—in one case overnight in the warehouse where they were found, and in another for the time necessary for the officers to bring them before the magistrate. Here the detention seems as brief, and *any* standard would cabin the officer's discretion to a greater extent than "plain view." *Cf. United States v. Sherwin*, 572 F.2d 196, 199–201 (9th Cir.1977) (plain view doctrine cannot authorize *permanent* warrantless seizures of material arguably subject to first amendment protections), *cert. denied*, 437 U.S. 909, 98 S.Ct. 3101, 57 L.Ed.2d 1140 (1978).

Third, the cases striking down search warrants as overly general all involve searches and seizures more extensive and burdensome and language more general than that at issue here. Thus, *Marcus v. Search Warrant*, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961), involved a warrant authorizing seizure of a distributor's entire stock of "obscene ... publications." The warrant in *United States v. Espinoza*, 641 F.2d 153 (4th Cir.), *cert. denied*, 454 U.S. 841, 102 S.Ct. 153, 70 L.Ed.2d 125 (1981), referred to "obscene magazines." *United States v. Cangiano*, 464 F.2d 320 (2d Cir.1972) (*Cangiano I*), *vacated on other grounds*, 413 U.S. 913, 93 S.Ct. 3047, 37 L.Ed.2d 1023, *and reinstated per curiam*, 491 F.2d 905 (2d Cir.1973), *cert. denied*, 418 U.S. 934, 94 S.Ct. 3223, 41 L.Ed.2d 1171 (1974), involved a warrant for material that was "obscene, lewd, lascivious and filthy." The warrant in *United States v. Torch*, 609 F.2d 1088 (4th Cir. 1979), *cert. denied,*. 446 U.S. 957, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980), authorized seizure of "copies of lewd, lascivious, and filthy films and magazines." The warrant in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979) contained *no standard at all*. (*See* Appendix B.) And the majority cannot help it along by citing an affidavit to which neither the Supreme Court (in its discussion of the "particularity" question) nor the warrant referred, *see, e.g., United States v. Roche*, 614 F.2d 6, 8 (1st Cir.1980); *In re Lafayette Academy, Inc.*, 610 F.2d 1, 4 (1st Cir.1979).

Fourth, the order here, in fact, offers a considerably narrower standard than its language suggests, for it states, in addition, that the material for which the agents are to look must be "of the same tenor" as three specific named magazines, *Turkish Delight, Sex Foto Fiction No. 1*, and *Sex Foto Fiction No. 2*. The policemen who stopped the truck included Officer McManus who had previously seen a copy of *Turkish Delight* in a Combat Zone store. The officers who searched through the boxes included FBI Agent Gilligan, who had examined all three magazines and presented them to the magistrate. Specific reference to these magazines would tend to narrow the officers' discretion in this area of "hard-core pornography," where a picture is worth a thousand words. *See Jacobellis v. Ohio, supra*.

Fifth, the detention that the order authorized was considerably more limited than the typical seizure. It allowed the officers only to stop the truck and to segregate material to present that same afternoon to the magistrate. The Supreme Court has recently emphasized that "[t]he intrusion on possessory interests occasioned by a seizure ... can vary both in its nature and extent," and that, in determining what procedural protections are required for a particular seizure, the court "must balance the nature and quality of the intrusion on the individual's fourth amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place,* — U.S. —, —, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983). The magistrate's prompt review of the materials seized by the agents provided an important limitation on the intrusion authorized by the initial order. *See Heller v. New York,* 413 U.S. 483, 492–93, 93 S.Ct. 2789, 2794–95, 37 L.Ed.2d 745 (1973) (both pre- *and post*-seizure safeguards are relevant in assessing propriety of seizure). And the fact that the magistrate viewed the preselected materials at the garage, not his chambers, neither impugns the magistrate's impartiality nor transforms him into a member of the prosecution team. *Compare Lo-Ji Sales, Inc. v. New York,* 442 U.S. at 326–28, 99 S.Ct. at 2324–25 (disapproving judicial officer's active participation in search) *with Heller v. New York, supra* (approving judge's travel to theater to see film before issuing warrant for it).

Sixth, to hold this language insufficiently particular, under these circumstances, seems to mean that one cannot ever constitutionally authorize a search for and seizure of items of hardcore pornography that are, as yet, unseen, no matter how concrete or compelling the cause for the search. Suppose hardcore pornography manufacturers and dealers decide to make, and to ship, each hardcore item only once. Do they then operate with immunity from search? Would immunity from search not make prosecution of the wholesaler and manufacturer significantly more difficult?

Can the same Constitution that allows a jury to rely on the standard set forth in the order's language as specific enough to put a bookseller behind bars, *see Miller v. California, supra,* forbid the use of that same standard to impose the much less serious restraint at issue here—at least when more specific standards cannot readily be devised and the resulting impediment to law enforcement seems so serious? These questions make me think that the case law approving language of the sort here at issue is correct and governs.

The strongest precedent in the majority's favor consists of the language that it quotes from *Stanford v. Texas* to the effect that, "As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." 379 U.S. 476, 485, 85 S.Ct. 506, 512, 13 L.Ed.2d 431 (1965) (quoting *Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927)). But, until now, courts have not insisted upon *literal* compliance with these words. *See, e.g., United States v. Marti, supra.* They have asked for *"reasonable* particularity and certainty as to the identity of the property to be searched for and seized." *United States v. Drebin,* 557 F.2d 1316, 1322 (9th Cir.1977) (emphasis added) (quoting *United States v. Quantity of Extracts, Bottles, etc.,* 54 F.2d 643, 644 (S.D.Fla.1931)), *cert. denied,* 436 U.S. 904, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978). What is "reasonable," of course, depends upon the type of material and the setting, *see Roaden v. Kentucky,* 413 U.S. 496, 501, 93 S.Ct. 2796, 2799, 37 L.Ed.2d 757 (1973); it also depends upon the ease with which one could formulate a more adequate description, *see, e.g., United States v. Marti,* 421 F.2d at 1268; *cf. Roaden v. Kentucky, supra.*

Were literal or technical specificity to be the order of the day, how could we allow officers to search for papers that might be the "instruments of a crime?" *See, e.g., Grimaldi v. United States,* 606 F.2d 332, 334 (1st Cir.) (book about currency as instrumentality of counterfeiting), *cert. denied,* 444 U.S. 971, 100 S.Ct. 465, 62

L.Ed.2d 386 (1979); *United States v. Cortellesso,* 601 F.2d 28, 33 (1st Cir.1979) (books and records as instrumentalities), *cert. denied,* 444 U.S. 1072, 100 S.Ct. 1016, 62 L.Ed.2d 753 (1980); *United States v. Fuller,* 441 F.2d 755 (4th Cir.) ("sports information papers" as instrumentalities of gambling operation), *cert. denied,* 404 U.S. 830, 92 S.Ct. 74, 30 L.Ed.2d 59 (1971). How could they be allowed to seize, for example, maritime charts or navigational books that may be "instruments" of, say, unlawful drug smuggling? *See United States v. Ayers,* 725 F.2d 806 at 808 (1st Cir.1984). I see nothing in the Constitution that gives hardcore pornography *more* protection against governmental searches than, say, a book about currency, or that protects the "obscene but not quite hardcore" magazine from mistaken seizure to a *greater* extent than the maritime atlas that the smuggler did not actually use.

In sum, the test that the majority uses strikes me as contrary to reasoned precedent that we must follow.

## II.

The question of "probable cause" is more difficult, but it is one that should be answered in terms of common sense, not technicalities. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* —— U.S. ——, ——, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). The very word "probable" itself is not meant to import technical concepts of statistical probability, but refers simply to "reasonable grounds for believing." *United States v. Melvin,* 596 F.2d 492, 495 (1st Cir.) (citing *Zurcher v. Stanford Daily,* 436 U.S. 547, 556 & n. 6, 98 S.Ct. 1970, 1977 & n. 6, 56 L.Ed.2d 525 (1978)), *cert. denied,* 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979). In applying this concept magistrates "are not to be confined by ... restrictions on the use of their common sense." *Spinelli v. United States,*

393 U.S. 410, 419, 89 S.Ct. 584, 591, 21 L.Ed.2d 637 (1969) (citing *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965)). They are to base their decision on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed.2d 1879 (1949). And, in reviewing the magistrate's decision, courts are "simply to ensure that the magistrate had 'a substantial basis for ... conclud[ing]' that probable cause existed." *Illinois v. Gates,* —— U.S. at ——, 103 S.Ct. at 2332 (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). They are to respect— we have previously spoken of showing "great deference" to—magistrates' probable cause determinations. *See United States v. Melvin, supra* (quoting *Spinelli v. United States, supra* ).

These principles applied to the affidavit (reprinted here as Appendix A) require us to hold the magistrate's decision lawful. A person of practical common sense could reasonably conclude on the basis of the affidavit that hardcore pornography would likely be found on the truck. The affidavit makes clear that the truck regularly supplied sexually explicit material to shops in the Combat Zone that regularly sold sexually explicit material. The applying officer supplied the magistrate with three "hardcore" examples from prior shipments. The affidavit says that the truck had left on another delivery that morning. Could anyone not immersed in legal technicalities read through the affidavit and then bet heavily *against* the truck containing (at least some) hardcore pornography?

Agent Gilligan's affidavit did not state that Imperial trucks had been shown to carry *films* on previous trips. But, it did state that Boston police officers had observed Imperial cartons from prior deliveries that contained a variety of materials, including not only magazines but also newspapers and books. In addition, the driver of one of the trucks was observed

servicing a "peep show" booth used for sexually explicit films, in the very place—646 Washington Street—to which Imperial made its deliveries of the magazines shown the magistrate. The facts that Imperial (1) repeatedly made wholesale deliveries; (2) of materials some of which the magistrate saw and found obscene; (3) to a shop that sold sexually explicit "peep shows" as well as books; (4) through the use of film machines that Imperial drivers serviced, together gave rise to probable cause that the truck could contain obscene films among the materials it was carrying. At a minimum, once the agents found films on the truck together with the other materials, these facts provided cause to believe that some legally obscene films would likely be found among them. (If there were no films on the truck, the inclusion of films in the order would seem harmless.) *See, e.g., United States v. Bush*, 582 F.2d 1016, 1020 (5th Cir.1978) (presence of obscene materials in one of six cartons in shipment creates probable cause that other five cartons also contain obscene materials); *Castle News Co. v. Cahill*, 461 F.Supp. 174, 182 (E.D.Wis.1978) (probable cause exists to search all items in box when judge examined "fair sample" of contents). Regardless, the basic issue is whether the magistrate could reasonably judge that the affidavit, read as a practical, common sense document, establishes a fair likelihood that agents would find hardcore pornography on the truck. The affidavit, attached here, best speaks for itself. My reading of it makes it impossible for me to say the magistrate was wrong.

The majority may reach a different result because it reads the affidavit without taking into account *in any way whatsoever* the officers' statements that the shops regularly sold sexually explicit material and that the truck regularly supplied this material. The cases on which it relies, however, simply forbid the magistrate to rely on the officers' *legal* judgments about whether particular sexually explicit material is, or is not, obscene. *See Lo-Ji Sales, Inc. v. New York, supra; Roaden v. Kentucky*, 413 U.S. at 502–03, 93 S.Ct. at 2800. If those legal judgments are necessary supports for the conclusion that obscene materials would likely be found (as in the short, opaque *Lo-Ji* affidavit, which we reprint below in Appendix C) then, of course, no warrant can issue. But *Lo-Ji* does not forbid the magistrate from reading the affidavit as showing that the shops specialize in, and regularly sell, sexually explicit material; nor, particularly when he is shown examples, does it forbid him to draw common sense, practical conclusions from that fact. He does not have to pretend that the three examples he was shown, *Turkish Delight, Sex Foto Fiction No. 1*, and *Sex Foto Fiction No. 2*, were discovered in a Sunday school library.

### III.

These disagreements may reflect a deeper disagreement about the *way* in which the majority seeks to reconcile first, and fourth, amendment interests. The majority seems to believe that the fourth amendment takes first amendment interests into account by giving special meanings to such words as "probable cause" or "particularly describing." They find special subrules within these legal categories that come into effect when a special subject matter, such as "obscenity," is at issue. Yet there is no need to follow so mechanical an approach. The fourth amendment expressly forbids *"unreasonable"* searches and seizures. Any search or seizure that takes inadequate account of first amendment interests is automatically "unreasonable." Given the presence of the word "unreasonable," do we need to depart from a common sense interpretation of the concept of probable cause, in asking whether an affidavit justifies a search and seizure? Is it necessary to proliferate subrules, some of which may unnecessarily threaten law enforcement interests, others of which may pay too little heed to the first amendment, and all of which threaten unnecessary rigidity and complexity?

If we face directly the question of whether the search is "unreasonable," however, we must conclude that it was not. That is

to say, the magistrate took appropriate account of the first amendment. The magistrate had before him an affidavit providing adequate basis to believe that searchers would find hardcore pornography, unprotected by the Constitution, in the truck. At the same time this hardcore pornography might be mixed with other, constitutionally protected, material; thus, the searchers might seize protected material through a mistake in judgment about which items were "hardcore."

Faced with circumstances showing the likely existence of seizable material, a need for a warrant, and a risk of first amendment injury, the magistrate devised a two-step procedure. First, the truck would be briefly detained to allow segregation of likely hardcore items. Second, he would then view those items himself, authorizing seizure of those *he* found hardcore. The object was to serve the ends of law enforcement in a manner least likely to restrict legitimate first amendment activity. The restriction consisted of a few hours of detention. A several hour restriction on availability of, and access to, books, magazines, papers, or records is not uncommon

when police with a warrant search, say, a house with a library, or a suitcase that may contain magazines as well as drugs. *See, e.g., United States v. Gilman, supra; G.I. Distributors, Inc. v. Murphy, supra. But cf. United States v. Place, supra* (ninety minute detention of suitcase unreasonably long, *in absence of* warrant or probable cause). The procedure ensured that the magistrate himself would "focus searchingly on the question of obscenity," *Marcus v. Search Warrant*, 367 U.S. at 732, 81 S.Ct. at 1716, before authorizing any longer seizure. And, any less restrictive procedure that would allow the police to obtain the unlawful, unprotected material would seem difficult, if not impossible, to devise.

The alternatives to this approach—a flexible approach that seeks to minimize intrusion upon constitutionally protected interests—seem to consist either of rules that forbid searches for as yet unexamined material *irrespective* of cause (and, such is not the law) or a set of rules that ends up less protective of first amendment interests. Under these circumstances, the Constitution does not make unlawful the search considered here.

## APPENDIX A

Form A. O. 106 (Rev. Apr. 1973)

Affidavit for
Search Warrant

# United States District Court
### FOR THE
DISTRICT OF MASSACHUSETTS

Docket No._____

UNITED STATES OF AMERICA

Case No._____

vs.

One truck bearing Rhode Island
commercial license 91826

AFFIDAVIT FOR
SEARCH WARRANT

BEFORE LAWRENCE P. COHEN
Name of Judge' or Federal Magistrate

Boston, MA
Address of Judge' or Federal Magistrate

The undersigned being duly sworn deposes and says:

That he has reason to believe that (on the person of) (on the premises known as) One truck bearing

Rhode Island commercial license

Attest to
True Copy
FREDERICK R. DeCESARIS
Clerk/Magistrate
By_____
Deputy Clerk

in the District.of Massachusetts

there is now being concealed certain property, namely, a quantity of obscene materials,
here describe property

including books, pamphlets, magazines, newspapers, films, and prints,

which are evidence of a violation of Title 18, United States Code,
here give alleged grounds for search and seizure

Section 1465, said violation being the transportation in interstate

commerce of obscene· matter for sale and distribution.

And that the facts tending to establish the foregoing grounds for issuance of a Search Warrant
are as follows:

I have been a Special Agent for ·the Federal Bureau of Investigation
for almost 15 years.

For the past year, I have been working closely with Bernard F. Hurley
and Charles A. McManus, both of whom are detectives with the City of
Boston Police Department. These two detectives had advised me that
they have spent the majority of their working time for the past few years
in enforcing the Commonwealth of Massachusetts' laws dealing with obscenity.
Together, they have taken part in numerous arrests and prosecutions which
(CONT. ON ATTACHED PAGES)

LAWRENCE GILLIGAN Signature of Affiant.
Special Agent, F.B.I.
 Official Title, if any.

Sworn to before me, and subscribed in my presence, February 28 , 19 78

LAWRENCE P. COHEN Judge or Federal Magistrate.

¹United States Judge or Judge of a State Court of Record.
²If a search is to be authorized "at any time in the day or night" pursuant to Rule 41(c), show reasonable cause therefor.
³If the warrant is to authorize execution pursuant to 21 U.S.C. § 879 without prior notice of authority or purpose, indicate the circumstances creating the
need for such a warrant.
FPI-LC 7-73-120M-7266

have resulted in many convictions for violations of the Commonwealth's
obscenity laws.

Hurley and McManus have advised me that they are familiar with
the various stores in Boston that regularly offer pornographic
materials for sale to the public. Most of these stores are located
along a stretch of Washington Street in Boston in a section commonly
known as the Combat Zone. In the course of their duties, Hurley
and McManus have entered these stores, both within and outside the
so-called Combat Zone, and have observed what is available for sale
to the public. In the opinions of Hurley and McManus, the chief
business of these stores is to regularly offer for sale numerous
items, including books, magazines, prints, and films, which are
obscene as a matter of law.

During their police work, Hurley and McManus had made observa-
tions concerning how the aforementioned stores are supplied and
stocked. Hurley has advised me that on Tuesday, April 29, 1975,
during the afternoon, he observed a panel truck bearing Rhode Island
commercial license plate number 18418 in the vicinity of the United
Discount House Corp., located at 642-646 Washington Street in Boston.
This store is known by Hurley to offer pornographic materials for
sale to the public. Hurley observed a male individual take seven
cartons out of the panel truck, and_bring them inside the store at
646 Washington St. The same male individual soon came out with
three cartons--one carton bearing a marking "United"--and placed
the three cartons in the panel truck. Hurley advised that shortly
thereafter, he ran a registration listing on R.I. commercial license
18418, and it was listed to Kenneth F. Guarino, 40 Hopkins Ave.,
Johnston, R. I.

Hurley advised me that on Tuesday, May 20, 1975, he observed
a panel truck bearing R.I. commercial license plate number 89491
park ·in the vicinity of 646 Washington St., Boston, at about ·2:05 P.M.

He observed a male individual deliver some cartons from the truck to the store at 646 Washington St. The panel truck then proceeded to The Boylston Book Store at 10 Boylston St., Boston. The same male individual was seen to deliver ten large cartons and one small carton to this establishment. Shortly thereafter, he exited the store with two large cartons and one small white carton which he placed in the truck. This individual then proceeded to The Book & Gift Shop located at 225 Tremont St., Boston. He took eight cartons from the truck, and delivered them into the store. Shortly thereafter, he exited the store with four cartons which he placed in the truck. Both The Boylston Book Store and The Book & Gift Shop are known by Hurley to offer pornographic materials for sale to the public. However, the latter shop is no longer in business at this time. Hurley told me he ran a listing on R.I. commercial license 89491, and it was listed to Imperial Distributors, Inc., 208 Laurel Hill Ave., Providence, R. I.

Hurley advised me that on Tuesday, December 21, 1976, at about 1:10 P.M., he observed a blue van-type truck bearing R.I. commercial license plate 44457 in the Combat Zone area of Boston. A male individual was observed to deliver one carton to United Discount at 646 Washington St. and five cartons to Zone Book, Inc., at 10 Boylston St., a store known by Hurley to offer pornographic material for sale to the public.

Hurley advised me that on Tuesday, June 7, 1977, he observed a van bearing R.I. commercial plate 44457 in the Combat Zone. A male individual was observed to make a delivery to Zone Book, Inc., at 10 Boylston St.

Hurley advised me that on Monday, October 17, 1977, he observed a vehicle bearing R.I. commercial license plate 89491 park in the vicinity of United Discount at 646 Washington St. A male individual exited the vehicle, and entered United Discount. This male individual remained in the store for about twenty minutes, and was observed servicing the peep show film machines therein. Hurley advised me that the peep show film machines are operated by placing 25 cents in the machine, such that the film runs for a few minutes. If the customer desires to see the whole film, the customer must insert another 25 cents every few minutes. Hurley advised that he and McManus have periodically checked on the nature of the films in these peep show machines, and, in their opinion, the films have invariably displayed various types of hard-core pornography.

Hurley advised me that on Tuesday, November 1, 1977, he observed a vehicle bearing R.I. commercial plate 44457 in the Combat Zone. A male individual was observed to deliver six cartons marked "J.P." to the establishment at 694 Washington St. Hurley advises that Joe P. Enterprises, Inc., Marble Distributors, Inc., Granite Mail Order House, Inc., and United Books, Inc., are all listed at this address. Hurley advised that these firms are known to distribute pornographic material to other stores for sale to the public. For instance, Hurley advised me that Anthony Russo holds all the corporate offices in both Joe P. Enterprises, Inc., and United Books, Inc.; that Russo also owns Liberty Book Store at 4 Boylston St., Boston, which store regularly offers pornographic material for sale to the public.

Hurley advised me that on Tuesday, January 10, 1978, he observed a vehicle bearing R.I. commercial plate 91826 in the Combat Zone. A male individual was observed to exit the vehicle, and make a delivery to United Discount at 646 Washington St. Hurley advised that shortly thereafter, he and Detective McManus entered the store. On the counter in front of store employee Albert McCarthy was an invoice dated January 9, 1978 from "Imperial" to "United Discount." I ran a listing on plate 91826, and found that it was registered to Kenneth F. Guarino, 208 Laurel Hill Ave., Providence, R. I.

Hurley advised me that on Tuesday, January 17, 1978, at about 10:30 A.M., he observed a vehicle bearing R.I. commercial plate 91826 to park in the vicinity of the Eros Theatre at 673 Washington St. A male individual was observed to exit the vehicle, and deliver one box to the 200 Book Club, Inc., at 696 Washington St. Hurley advised me that this establishment regularly offers pornographic material for sale to the public.

The male individual was then observed to deliver nine cartons to United Discount at 646 Washington St. The same individual was then seen to deliver twelve cartons to Boylston Book Store at 10

Boylston St. He exited this store with three cartons. He was next observed to walk back to the Eros Theatre, and enter said theatre while holding a piece of paper in his hand. This male individual appeared to be about 5'9", white, short beard, dark hair, 25 to 30 years old, balding on the back of his head, wearing a fur-lined brown jacket.

At about 2:00 P.M., Detectives Hurley and McManus entered United Discount at 646 Washington St. Store employees Albert McCarthy and Robert Murray were observed to be putting magazines into transparent plastic covers, and sealing said covers. Cartons marked "United Discount" were open, and McCarthy and Murray were sealing magazines taken from these cartons. Hurley and McManus both observed the open cartons, and could see that they contained various magazines, books and newspapers. Among the items that McCarthy was seen to seal was a magazine entitled "Turkish Delight." The front cover of the magazine depicted a male and female engaging in cunnilingus, while the back cover showed a male and female engaging in intercourse. On the counter close to where McCarthy was sealing publications, an invoice marked "Imperial" was observed.

On Tuesday, January 24, 1978, at about 11:34 A.M., I observed a blue Ford van truck bearing R.I. commercial plate 91826 parked in front of the Eros Theatre at 673 Washington St., Boston. I entered an "adult book store" at 673B Washington St., and observed four cartons piled on the floor next to a store employee. Within a couple of minutes, a white male weighing about 250 pounds appeared and presented a check to another white male who was about 6'0", 26 to 28 years old, 165 pounds, black hair with a thin black beard. This latter white male left the premises after receiving the afore-mentioned check. I observed the blue Ford van driven diagonally across the street to 646 Washington St., and the white male who had received the aforementioned check was observed to deliver three cartons at 646 Washington St. Fellow F.B.I. Agent Daniel J. Quigley then observed the same white male deliver four cartons to 12-14 Boylston St., Boston.

On Thursday, January 26, 1978, I went to the United Discount store at 646 Washington St., Boston. Offered for sale at this time were numerous magazines in sealed transparent plastic envelopes, including a magazine entitled "Turkish Delight." I purchased one copy of "Turkish Delight" for $6.00. I have reviewed the contents of this magazine. On the front cover a male and female are shown engaging in cunnilingus; on the back, a male and female are engaging in intercourse. The remainder of the magazine displays numerous acts of fellatio, cunnilingus and intercourse with the camera angle emphasizing the genitalia as much as possible.

Fellow F.B.I. Agents Philip Reilly and Edward Kavanagh advised me that on Tuesday, January 31, 1978, they were on surveillance in the vicinity of Imperial Distributors, Inc., at 208 Laurel Hill Ave., Providence, R. I. At about 9:20 A.M., they observed a van-type truck bearing commercial R.I. plate 44457 being loaded with cartons from the loading dock area of Imperial Distributors, Inc. This truck was observed leaving 208 Laurel Hill Ave. at about 9:38 A.M. Reilly and Kavanaugh followed the truck across the state line into Massachusetts, and up into Boston. At about 10:56 A.M., I observed a blue van bearing R.I. commercial license 44457 turn into Washington St., Boston, from Kneeland St. It parked in front of 694 Washington St. The driver was observed to bring three or four cartons into 694 Washington St. The van then was driven to 673 Washington St. Three cartons were delivered to 673B Washington St. I then entered 673B Washington St., and observed a male clerk behind the counter conversing on the telephone. I heard the clerk say, "I have a C.O.D. from Imperial Distributors."

The driver of the R.I. van was next observed to deliver one carton to a book store on LaGrange Street. He then drove to 646 Washington St., where he delivered four cartons. I then entered United Discount at 646 Washington St. I observed that Boston Police Detectives Hurley and McManus were already within the store. McManus showed me the cartons which the R.I. driver just delivered. The Cartons were piled up on the floor near the attendant's counter in the rear of the store. A store clerk was observed removing magazines from one of the cartons, and he was seen counting the magazines. I observed the titles on two of the magazine that the clerk was counting. The titles were "Sex Foto Fiction No. 1" and "Sex Foto Fiction No. 2."

Fellow F.B.I. Agent James A. Yacobucci advised me that on February 2, 1978, at about 10:30 A.M., he went to United Discount at 646 Washington St., Boston, and at the rear of the store on a magazine rack he saw displayed magazines entitled "Sex Foto Fiction No. 1" and "Sex Foto Fiction No. 2." He purchased the two magazines for $6.00 each. Yacobucci turned the magazines over to me. I have reviewed both magazines. They both display numerous acts of fellatio, cunnilingus and intercourse with the camera emphasizing the genitalia as much as possible.

Detective Hurley advised me that on Tuesday, February 14, 1978, he observed a truck bearing R.I. commercial plate 91826 parked at 681 Washington St., Boston, about 1:00 P.M. Thereafter, Hurley observed a white male take seven cartons from the truck, and deliver them to 646 Washington St. The white male then made three delivery trips to 10 Boylston St., delivering some eighteen cartons. He exited 10 Boylston St. with five cartons.

Fellow Agent Philip Reilly advised me that on Tuesday, February 21, 1978, he was on surveillance duty at 208 Laurel Hill Ave., Providence, R. I. He stated that he observed a truck bearing R.I. commercial plate 91826 loaded with about 35 or 40 cartons from the loading dock area of Imperial Distributors, Inc. The truck departed at about 9:35 A.M. Reilly followed the truck over the state line into Massachusetts. At about 11:00 A.M., I observed a truck bearing R.I. commercial plate 91826 turn into Washington St., Boston. A white male driver was observed to deliver nine cartons at 673B Washington St., ten cartons at 646 Washington St., thirteen cartons at 10 Boylston St., and two cartons at 18 LaGrange St., all of Boston.

Fellow F.B.I. Agent Edward Kavanagh advised me that today at 8:18 a.m., he was on surveillance at Imperial Distributors, Inc., 208 Laurel Hill Ave., Providence, R.I. He observed a truck bearing R.I. commercial plate 91826 being loaded with cartons at the Imperial Distributors loading dock. The truck left Imperial Distributors at about 9:32 a.m. The truck was observed to cross the state line into Massachusetts. For the foregoing reasons, I believe that a truck bearing R.I. commercial plate 91826 contains obscene, lewd, lascivious, and filthy books, magazines, newspapers, prints, and other matter of an indecent and immoral character, and that said truck has transported said materials in interstate commerce for the purpose of sale and distribution; all in violation of Title 18, United States Code, Section 1465.

### APPENDIX B

## Lo-Ji Sales Search Warrant
### (reproduced from Supreme Court Record App. at 8a – 26a)

# LOCAL CRIMINAL COURT
## Town of Wawayanda, County of Orange, State of New York

#### HONORABLE JOHN O'CONNOR,

*Issuing Judge.*

### To ANY POLICE OFFICER OF THE NEW YORK STATE POLICE

You are hereby authorized and directed to search the following premises: a single story brown wood frame build-

ing named "Adult Store", located on Route 17M directly across from the Chadwick Motel in the Town of Wawayanda, Orange County, New York.

You are hereby authorized and directed to search for and seize the following property, to wit:

1.) 200 foot reels of 8mm motion picture film entitled LINDA AND DUKE.

2.) 200 foot reels of super 8mm motion picture film entitled FOUR FOR DINNER.

3.) The following items that the Court independently has determined to be possessed in violation of Article 235 of the Penal Law:

[In the warrant as originally issued, this space was left blank. After the search, it was filled in with a multi-page list of the items found by the search party.]

This warrant must be executed not more than 10 days after the issuance and any property seized pursuant hereto shall be returned and delivered to the Court without unnecessary delay.

The Court hereby specially determines that this Warrant shall constitute notice to any persons arrested or charged pursuant to its execution, that they are entitled to immediate adversary hearing, as soon as practicable, so that a determination can be made as to whether or not the material seized was possessed in violation of Article 235 of the Penal Law.

DATED: Goshen, New York
 June 25, 1976

 /s/ JOHN O'CONNOR
 *Local Justice*

APPENDIX C
Lo-Ji Sales Affidavit
(reproduced from Supreme Court
Record App. at 5a – 7a)

## LOCAL CRIMINAL COURT
### Town of Wawayanda

AFFIDAVIT

◆

## IN THE MATTER

—of—

THE APPLICATION OF INV. J. A. HURBANEK OF THE NEW YORK STATE POLICE, FOR A SEARCH WARRANT TO SEARCH THE FOLLOWING PREMISES: A single story brown wood frame building named "Adult Store", located on Route 17M directly across from the Chadwick Motel in the Town of Wawayanda, Orange County, New York.

◆

STATE OF NEW YORK,
COUNTY OF ORANGE, ss.:

I, JOHANNES A. HURBANEK, being duly sworn, deposes and says:

1. I am the applicant herein and am a public servant of the kind specified in Criminal Procedure Law, Section 690.05(1), my title being Investigator with the Bureau of Criminal Investigation of the New York State Police.

2. There is reasonable cause to believe that certain property hereinafter described may be found in the following premises: a single story brown wood frame building named "Adult Store", located on Route 17M directly across from the Chadwick Motel in the Town of Wawayanda, Orange County, New York.

3. The property referred to sought to be seized is property that has been used and is possessed for the purpose of being used to commit an offense to wit: Obscenity in the Second Degree, in violation of Section 235.05(1) of the Penal Law, Promoting Obscene Material.

3. In support of your deponent's assertion as to the existence of reasonable cause, the following facts are offered based upon personal knowledge as attested to by your deponent. On June 20, 1976, I personally was present in the aforedescribed premises (Adult Store) and purchased from Alexander Mandakis one reel of 8mm motion picture film approximately 200 feet in length called LINDA AND DUKE. Upon viewing this reel of motion picture film, I observed it to contain acts of female masturbation and activities involving beastiality in that a female participant in the movie attempted to engage in acts of sexual intercourse with a German Shepard type dog. I also purchased a reel of super 8mm motion picture film approximately 200 feet in length entitled FOUR FOR DINNER. Upon viewing this reel of film, I observed acts of sexual intercourse, sodomy, fellatio, cunnilingus, and masturbation. These reels of film are presently in my possession and are available for the viewing of the Court so that it may independently determine whether or not the acts portrayed come within the statutory prohibition under Article 235 of the Penal Law.

4. While in the premises, I observed what I have reasonable cause to believe are the same or similar films. I also observed in the premises other reels of film, magazines and other objects. Based upon my observations, and my conversations with Mr. Mandakis which indicated to me that

the films and magazines portrayed similar activities as described above, I have reason to believe that this material is being possessed in violation of Article 235 of the Penal Law of the State of New York.

5. The foregoing represents the grounds for my belief.

6. It is further respectfully requested that the Court accompany deponent at the time of the exectuion of the warrant applied for so that it can independently determine under the applicable legal principles whether or not any of the additional material present in the aforedescribed premises is in fact possessed in violation of the law and therefore subject to seizure.

WHEREFORE, your deponent requests that the Court issue a search warrant directing a search for and seizure of the following property:

1.) 200 foot reels of 8mm motion picutre film entitled LINDA AND DUKE.

2.) 200 foot reels of super 8mm motion picture film entitled FOUR FOR DINNER.

3.) Any other material that the Court may independently determine upon viewing to be possessed in violation of Article 235 of the Penal Law.

/s/ J. A. HURBANEK
Johannes A. Hurbanek

Sworn to before me this
25 day of June, 1976.
/s/ JOHN O'CONNOR, T.J.