**SUPREME VIDEO, INC., Plaintiff,**

**v.**

**Steven SCHAUZ, James Thome and One or More John Does, Defendants.**

**No. 91–C–773.**

United States District Court,
E.D. Wisconsin.

Dec. 14, 1992.

Jeff Scott Olson, Julian, Olson & Lasker, Madison, WI, for plaintiff.

Gregg T. Heidenreich, Schuch & Stilp, Milwaukee, WI, for defendants.

## DECISION AND ORDER

RANDA, District Judge.

### PRELIMINARY BACKGROUND

This is a civil rights action pursuant to 42 U.S.C.1983 brought by an adult video store, Supreme Video, Inc., (Supreme Video), against an Oshkosh police detective, Steven Schauz (Schauz), the Oshkosh Chief of Police, James Thome (Thome), and the City of Oshkosh (Oshkosh). Supreme Video alleges in an Amended and Supplemental Complaint that Thome, Schauz and Oshkosh, through eight separate violations of law relative to an investigation, issuance of a search warrant, and search and seizure pursuant to said warrant, violated Supreme Video's rights under the 1st, 4th, and 14th Amendments to the U.S. Constitution. The matter comes before the Court on the parties' cross-motions for summary judgment.

The Court has reviewed the pleadings, the affidavits, the findings of fact and responses thereto, the briefs, and all other filings and rules as follows:

Plaintiff's motion is denied and Defendants' motion is granted in full.

## FACTUAL BACKGROUND

### 1. Wisconsin's Obscenity Statute

Wisconsin's current obscenity statute, Wis.Stat. § 944.21, was enacted in 1988, eight years after the preceding statute had been held unconstitutional by the Wisconsin Supreme Court. *Kucharek v. Hanaway*, 902 F.2d 513, 515 (7th Cir.1990). Although the current statute represents a compromise between booksellers and the legislature, stopping well short of the obscenity restrictions authorized by the U.S. Supreme Court in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), the constitutionality of the new statute was quickly challenged in *Kucharek v. Hanaway*, 714 F.Supp. 1499 (E.D.Wis. 1989). Judge J.P. Stadtmueller concluded that the statute was unconstitutionally vague and violated equal protection guarantees, and issued a preliminary injunction enjoining enforcement of the statute. *Id.*, at 1522.

The State appealed, and in a decision dated May 7, 1990, the 7th Circuit reversed, directing Judge Stadtmueller to dissolve the injunction and dismiss the case entirely. *Kucharek*, 902 F.2d at 521. The plaintiff subsequently petitioned the U.S. Supreme Court for review, which was denied in a decision dated January 7, 1991. *Kucharek v. Hanaway*, 498 U.S. 1041, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991). Judge Stadtmueller, however, did not formally dissolve the injunction until April 23, 1991. *Kucharek v. Hanaway*, Case No. 88–C–657, Docket Entry No. 29 (April 23, 1991).

### II. The City's Investigation and Search Warrant

The foregoing dates are important because of the timing of the defendants' search and seizure. In or around January, 1991, Joseph Paulus, the District Attorney for the City of Oshkosh, and Michael Novotny, a detective with the City of Oshkosh Police Department, began discussing the possibility of investigating video stores in the area for violations of Wisconsin's obscenity statute. (Olson Aff. at Exhibit C, p. 1.) Those discussions coincided with the U.S. Supreme Court's denial of certiorari in

the *Kucharek* case. Subsequently, in or around March, 1991, Novotny asked defendant Schauz, a fellow detective with the Oshkosh Police Department, to assist him in the investigation, and Schauz agreed. (Novotny Aff. at ¶ 2; Schauz Aff. at ¶ 1.) Thereafter, Novotny approached defendant James Thome, the Chief of Police for the City of Oshkosh, and requested permission to undertake the investigation. (Thome Aff. at ¶¶ 2–3; Novotny Aff. at ¶ 3.) Having received permission from Chief Thome, both Novotny and Schauz met with District Attorney Paulus, who explained how the investigation should proceed. (Novotny Aff. at ¶ 5; Schauz Aff. at ¶ 2.)

Pursuant to Attorney Paulus' instructions, Schauz purchased three (3) videotapes from the plaintiff, Supreme Video, on April 2, 1991. (Schauz Aff. at ¶ 3.) The videos were entitled "Alex Derenzy's Juicy Lucy", "Wall to Wall The Way You Like It" and "Home Movie Productions". (Schauz Aff. at ¶ 4.) "Juicy Lucy" was apparently a single-issue, nonserial work. The other two videos, however, were individual volumes in two separate series of movies generically entitled "Wall to Wall" and "Home Movie Productions", respectively. (Plaintiff's Proposed Findings of Fact at ¶¶ 12, 17; Defendants' Response to Plaintiff's Proposed Findings of Fact at ¶¶ 12, 17.) The individual volumes contained in each movie series were "wholly different movie[s]", packaged in boxes that "obviously identify the different volumes as separate, different movies", and had cover graphics using "different colors" and "depict[ing] different actors engaging in different activities". (Plaintiff's Proposed Findings of Fact at ¶¶ 17–23; Defendants' Response to Plaintiff's Proposed Findings of Fact at ¶¶ 17–23.) Each volume, however, bore the same generic title as every other volume within the series. (Defendants' Proposed Findings of Fact at ¶ 14; Plaintiff's Response to Defendants' Proposed Findings of Fact at ¶ 14.) After purchasing the three videos, Schauz watched each movie and narrated a candid summary of their contents in a report he submitted to District Attorney Paulus. (Schauz Aff. at ¶¶ 5–6, Exhibit A.) Upon

reviewing the report, Paulus concluded that probable cause existed for a violation of Wisconsin's obscenity statute. (Schauz Aff. at ¶ 7.) Accordingly, Paulus prepared an affidavit for Schauz' signature summarizing the content of the movies, which was used in support of an application for a warrant to search the premises of Supreme Video. (Schauz Aff. at ¶ 8; Plaintiff's Proposed Findings of Fact at ¶ 14; Defendants' Response to Plaintiff's Proposed Findings of Fact at ¶ 14.) Schauz reviewed the affidavit, found it to be true and correct, and signed it. (Schauz Aff. at ¶ 8.)

Prior to requesting the search warrant, however, both Novotny and Schauz, aware of the injunction previously issued by Judge Stadtmueller, asked District Attorney Paulus whether the investigation could proceed. (Schauz Aff. at ¶ 12; Novotny Aff. at ¶ 11.) Paulus advised the officers that the investigation could proceed because the U.S. Supreme Court had overturned Judge Stadtmueller's decision and had held the obscenity statute constitutional. (Id.; See also, Defendants' Proposed Findings of Fact at ¶ 16; Plaintiff's Response to Defendants' Proposed Findings of Fact at ¶ 16.) In addition, Detective Schauz was advised around that time, by an individual who remains nameless, that he should seize all volumes of any movie series for which he had reviewed a single volume, such as the "Wall to Wall" and "Home Movie Productions" series. (Plaintiff's Proposed Findings of Fact at ¶ 11; Defendants' Response to Plaintiff's Proposed Findings of Fact at ¶ 11.)

A search warrant was then prepared and submitted, along with Schauz' affidavit, for review by the Hon. William Crane, Circuit Court Judge for Winnebago County. Neither the warrant nor the affidavit expressly indicated that the movies "Wall to Wall The Way You Like It" and "Home Movie Productions" were individual volumes in a series of movies, nor is there anything in the record indicating that Schauz informed Judge Crane of his intention to seize all volumes within these two series. (Novotny Aff. at Exhibits B–D; Plaintiff's Proposed Findings of Fact at ¶ 16; Defendants' Re-

sponse to Plaintiff's Proposed Findings of Fact at ¶ 16.) Judge Crane reviewed the warrant and supporting materials, and signed the warrant without modification. As to what was to be seized, the warrant read as follows:

> ... copies of the cassettes Wall to Wall the Way You Like It, Alex Derenzy's Juicy Lucy and Home Movie Productions as well as the records, documents and writings relating to the original receipt, rental and/or sale, retention and/or storage of the above-named video cassette tapes, including any duplicate copies thereof, by said business establishment, directory, source book or guide which contains specific reference to or representation of the above-named video cassette tapes, advertisement, literature, flyers, pamphlets, pictures, posters, lists and notebooks containing specific reference to or representation of the above-named video cassette tapes or any other evidence which may constitute a violation of Sec. 944.21, Wis.Stats.

(Novotny Aff. at Exhibit C.)

### III. Execution of the Warrant

On April 6, 1991, Detective Schauz, along with other officers of the Oshkosh Police Department, executed the search warrant. (Schauz Aff. at ¶ 13.) Schauz and the other officers first informed Thomas Ruby, the Supreme Video employee present during the search, that they were there to seize "all movies of Wall to Wall, Juicy Lucy and Home Movie Productions." (Plaintiff's Proposed Findings of Fact at ¶ 28; Defendants' Response to Plaintiff's Proposed Findings of Fact at ¶ 28.) Thereafter, in addition to certain business records, Schauz and the other officers seized one copy each of Wall to Wall, volumes 1–4, 8–15, 17 and 18, along with three (3) copies each of Home Movie Productions, editions 2 and 4, two (2) copies each of Home Movie Productions, editions 3 and 5, and one copy each of Home Movie Productions, editions 1 and 6–8. (Plaintiff's Proposed Findings of Fact at ¶¶ 29–31; Defendants' Response to Plaintiff's Proposed Findings of Fact at ¶¶ 29–31.) These videos were seized from an inventory of approximately 2,000 video-tapes. (Defendants' Proposed Findings of Fact at ¶ 23; Plaintiff's Response to Defendants' Proposed Findings of Fact at ¶ 23.)

Subsequent to the seizure, counsel for Supreme Video sent a letter to Detective Schauz, making the following demands: (1) the immediate copying and return of all business records seized; (2) the immediate return of all duplicate copies of videotapes seized; (3) a prompt, judicially supervised adversary hearing as to each and every videotape on the issue of whether it violates section 944.21; and (4) in the event the search was conducted without prior approval from the State Attorney General, the immediate return of all items seized and a notice of injury pursuant to Wis.Stat. § 893.80. (Amended and Supplemented Complaint at Exhibit C.) Copies of this letter were sent to Chief Thome, District Attorney Paulus, and the City Clerk. (Id.) Over the course of three (3) subsequent letters from Attorney Paulus, the City responded by returning all duplicate and some original copies of the videotapes seized, along with some or all of the business records seized; the City retained, however, single copies of twelve (12) videotapes. (Plaintiff's Proposed Findings of Fact at ¶¶ 38–40; Defendants' Response to Plaintiff's Proposed Findings of Fact at ¶¶ 38–40; Amended and Supplemental Complaint at Exhibits D–F.) The requested judicially supervised hearing was not held, (Plaintiff's Proposed Findings of Fact at ¶ 41; Defendants' Response to Plaintiff's Proposed Findings of Fact at ¶ 41.), and to date, Supreme Video has not been charged with or convicted of a violation of Wis.Stat. § 944.21. (Plaintiff's Proposed Findings of Fact at ¶ 34; Defendants' Response to Plaintiff's Proposed Findings of Fact at ¶ 34.)

### IV. The Lawsuit

Supreme Video commenced this action on July 15, 1992. (Plaintiff's Proposed Findings of Fact at ¶ 5; Defendants' Response to Plaintiff's Proposed Findings of Fact at ¶ 5.) Supreme Video claims that Chief Thome and Detective Schauz violated Supreme Video's rights under the First,

Fourth and Fourteenth Amendments to the United States Constitution by virtue of the search conducted of its premises and the resulting seizure and retention of alleged pornographic videotapes. Specifically, Supreme Video claims separate constitutional violations for each of the following alleged violations of law:

1. The defendants violated the plaintiff's Fourth Amendment rights by seizing property they knew or should have known exceeded the scope of the search warrant;

2. Defendant Schauz made material omissions and misrepresentations in his sworn application for the search warrant in violation of plaintiff's Fourth Amendment rights;

3. The defendants' failure to grant plaintiff a prompt, post-seizure, judicially supervised adversary hearing regarding the alleged obscenity of the seized materials, and their execution of the warrant with the knowledge that they could not provide such a hearing, violated plaintiff's rights under the First, Fourth and Fourteenth Amendments;

4. The defendants violated the Fourth Amendment when they applied for and executed the search warrant before the formal dissolution of Judge Stadtmueller's injunction issued in the *Kucharek* case;

5. The defendants did not request or allow the judge to examine the allegedly obscene pictures or passages within the context of the work they appear;

6. The defendants obtained a search warrant which authorizes an unreasonable seizure within the meaning of the Fourth Amendment because it provides for seizure of all copies of the allegedly obscene tapes, not just the minimum needed for evidentiary purposes;

7. The defendants' wrongful actions constitute an unlawful prior restraint upon free expression protected by the First Amendment; and

8. The defendants violated state law and plaintiff's Fourth Amendment rights by executing the warrant without first obtaining permission from the State Attorney General.

(Amended and Supplemental Complaint at ¶¶ 501, A–1.)

Supreme Video sues Chief Thome and Detective Schauz in both their personal and official capacities. In their personal capacities, Supreme Video seeks unspecified compensatory damages and punitive damages from both Thome and Schauz. In their official capacities, Supreme Video seeks injunctive relief against the City of Oshkosh (1) requiring the City to return the items seized during the search and (2) enjoining the City from conducting future seizures of allegedly obscene materials unless the City conducts a timely post-seizure judicial hearing to determine whether the articles seized are legally obscene. Defendants moved (in some instances in rudimentary fashion) for summary judgment dismissing all of the foregoing claims on qualified immunity and other legal grounds. Supreme Video opposed that motion and also cross-moved for partial summary judgment on claims 1, 3 and 4 above.

## LEGAL ANALYSIS

■■■ The distinctions between personal-capacity suits and official-capacity suits are now well-established. "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). "Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent'." *Id.*, quoting *Monell v. Department of Social Services*, 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978). Thus, "in all respects other than name", an official-capacity suit is "to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity." *Id.*, 473 U.S. at 166, 105 S.Ct. at 3105. As for defenses to liability, "an official in a personal-capacity action may, depending on his position, be able to assert

personal immunity defenses, such as objectively reasonable reliance on existing law." *Id.*, at 166–67, 105 S.Ct. at 3105. "In an official-capacity action, these defenses are unavailable." *Id.*, at 167, 105 S.Ct. at 3106. "The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, qua entity, may possess, such as the Eleventh Amendment." *Id.*

## I. PERSONAL LIABILITY

### A. Qualified Immunity and the Basis for Personal Liability.

■ 42 U.S.C. § 1983 creates personal liability for any person who, under color of state law, deprives another person of any right, privilege or immunity secured by the United States Constitution. On its face, the statute admits of no immunities, not even for state or municipal officials. *Malley v. Briggs*, 475 U.S. 335, 339, 106 S.Ct. 1092, 1095, 89 L.Ed.2d 271 (1986). However, "[a]lthough the [Supreme] Court has recognized that in enacting § 1983 Congress must have intended to expose state officials to damages liability in some circumstances, the section has been consistently construed as not intending wholesale revocation of the common-law immunity afforded government officials." *Procunier v. Navarette*, 434 U.S. 555, 561, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978). Thus, the Court has interpreted the statute "in harmony with general principles of tort immunities and defenses rather than in derogation of them." *Malley*, 475 U.S. at 339, 106 S.Ct. at 1095, quoting *Imbler v. Pachtman*, 424 U.S. 409, 418, 96 S.Ct. 984, 989, 47 L.Ed.2d 128 (1976). Accordingly, state officials sued under § 1983 are generally accorded the same scope of immunity as their federal counterparts in actions brought directly under the Constitution. *Id.*, 475 U.S. at 340, n. 2, 106 S.Ct. at 1095 n. 2.

■ The Supreme Court has recognized two forms of immunity defenses for state and federal officials. "For officials whose special functions or constitutional status requires complete protection from suit, [the Court has] recognized the defense of 'absolute immunity'." *Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982). The defense of absolute immunity, however, has been limited to legislators exercising their legislative functions, judges exercising their judicial functions, and certain executive officials exercising prosecutorial or adjudicative functions. *Id.* "For executive officials in general, ... [the] cases make plain that qualified immunity represents the norm." *Id.*

That norm applies here. In *Malley v. Briggs*, the Supreme Court held that a police officer is entitled to assert a defense of qualified immunity in a § 1983 action alleging that the officer requested and executed an arrest warrant that was not supported by probable cause, resulting in an unconstitutional arrest. *Malley*, 475 U.S. at 344–45, 106 S.Ct. at 1097–98. Although the *Malley* case involved an allegedly defective arrest warrant, the Court noted that the distinction between an arrest warrant and a search warrant would not make a difference in the degree of immunity accorded the officer who applied for and enforced the warrant. *Id.*, at 344, n. 6, 106 S.Ct. at 1097, n. 6. Subsequently, in *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Supreme Court formally acknowledged that law enforcement officers may assert the defense of qualified immunity in civil actions arising from searches that allegedly violate the Fourth Amendment.

As defined, the qualified immunity defense is formidable. The defense "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341, 106 S.Ct. at 1096. It "is intended to shield public officials not only from liability, but also from the burdens of trial." *Green v. Carlson*, 826 F.2d 647, 651 (7th Cir.1987), citing *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) and *Harlow*, 457 U.S. at 816, 102

S.Ct. at 2737. To achieve this end, the *Harlow* case set forth a standard of "objective reasonableness", which was specifically designed to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738.

■ Under the "objective reasonableness" test, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.*[1] In the specific context of an allegedly unconstitutional search warrant, followed by an allegedly unconstitutional search and seizure, "[the Court's] good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization."[2] *Malley*, 475 U.S. at 345, 106 S.Ct. at 1098, quoting *United States v. Leon*, 468 U.S. 897, 922, n. 23, 104 S.Ct. 3405, 3420, n. 23, 82 L.Ed.2d 677 (1984).

■ While the foregoing issue is a question of law, "it is not answered in the abstract but in reference to the particular facts of the case." *Rakovich v. Wade*, 850 F.2d 1180, 1202 (7th Cir.1988). "Once the defendant's actions are defined or characterized according to the specific facts of the case this characterization is compared to the body of law existing at the time of the alleged violation to determine if constitutional, statutory, or case law shows that the now specifically defined actions violated the clearly established law." *Id.*, at 1209. "It is the plaintiff who bears the burden of establishing the existence of the allegedly clearly established constitutional right." *Id.* The plaintiff does not meet this burden by alleging the violation of broad constitutional rights, such as the right to due process or the right to be free from unreasonable seizures, and then claiming that such rights are "clearly established". *See generally, Anderson*, 483 U.S. at 639–40, 107 S.Ct. at 3038–39; *Schertz v. Waupaca County*, 875 F.2d 578, 583 (7th Cir.1989). Rather, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant,

1. The *Harlow* decision was a significant departure from the Court's prior decisions on the "good faith" or "qualified immunity" defense. Previously, the Court had ruled that qualified immunity had both an "objective" and "subjective" aspect. *Harlow*, 457 U.S. at 815, 102 S.Ct. at 2736. The objective element "involve[d] a presumptive knowledge of and respect for 'basic, unquestioned constitutional rights'." *Id.* The subjective element "refer[red] to 'permissible intentions'." *Id.* But in *Harlow*, the Court found that "[t]he subjective element of the good-faith defense frequently has proved incompatible with our admonition ... that insubstantial claims should not proceed to trial." *Id.*, at 815–16, 102 S.Ct. at 2737. This is because "subjective good faith has been considered to be a question of fact that some courts have regarded as inherently requiring resolution by a jury." *Id.*, at 816, 102 S.Ct. at 2737. Thus, "*Harlow* eliminated the subjective component from official immunity ... because searching for intent and other components of knowledge blocks the use of immunity as a shortcut to decision." *Elliott v. Thomas*, 937 F.2d 338, 344 (7th Cir. 1991). In other words, the subjective component was eliminated to facilitate resolution of these claims on summary judgment.

2. It is not entirely certain that a reasonably well-trained police officer should ever suspect, much less know, that his understanding of the vagaries of Fourth Amendment jurisprudence surpasses that of the presumably better-trained judge or magistrate who blessed the officer's endeavor with a warrant. This objection has been raised before. In *Malley*, the Supreme Court rejected the objection, stating that "the rule we adopt in no way 'requires the police officer to assume a role even more skilled ... than the magistrate'." *Malley*, 475 U.S. at 346, n. 9, 106 S.Ct. at 1098, n. 9. Rather, the Court reasoned, the rule simply ensures that, in cases where a magistrate acts so far outside "the range of professional competence of a magistrate", such that "his action is not just a reasonable mistake, but an unacceptable error indicating gross incompetence or neglect of duty", the officer cannot then "excuse his own default by pointing to the greater incompetence of the magistrate." *Id.* Although the officer is not asked to assume a role more skilled than the magistrate, he or she is asked to assume greater exposure because the magistrate cannot be sued. The official of "greater incompetence", it appears under these circumstances, is the official of greater immunity.

sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[3] *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039.

The purpose behind the foregoing rule is obvious. "[A]n official [cannot] reasonably be expected to anticipate subsequent legal developments, nor [can] he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. Unfortunately, while the purpose behind the rule is obvious, a reasoned application has proved elusive, because courts have understandably struggled with the obvious question underlying the entire analysis: At what point, and in what manner, does conduct achieve "unlawful" status in the eyes of the law, and for whom?

According to the Supreme Court, "the state of the law is evaluated by reference to the opinions of this Court, of the Courts of Appeals, or of the local District Court. . . ." *Procunier*, 434 U.S. at 565, 98 S.Ct. at 861. However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful. . . ." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. Instead, "it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.*

The 7th Circuit has attempted to refine the issue. Thus, "[t]he factual circumstances of the alleged violation need not be 'identical' to prior holdings in order to find an officer entitled to qualified immunity." *Rakovich*, 850 F.2d at 1209, citing *Le Clair v. Hart*, 800 F.2d 692, 696 (7th Cir.1986). On the other hand, there is no qualified immunity if the defendant violated "a clearly established and well litigated general proposition in which the case at hand merely presents a new factual wrinkle." *Id.*,

quoting *People of Three Mile Island ex. rel. Three Mile Island Alert, Inc. v. Nuclear Regulatory Comrs.*, 747 F.2d 139, 148 (3rd Cir.1984). Still, "[c]losely analogous cases, those decided before the defendants acted or failed to act, are required to find that a constitutional right is clearly established", and "to conclude that reasonably diligent government officials would have known of the case law, related it to the situation at hand, and molded their conduct accordingly." *Id.*, quoting *Powers v. Lightner*, 820 F.2d 818, 821 (7th Cir.1987) and *Lojuk v. Johnson*, 770 F.2d 619, 628 (7th Cir.1985), respectively. Yet again, "this does not mean that only binding precedent will clearly establish a right." *Id.* In fact, "[i]n the absence of binding precedent, a court should look to whatever decisional law is available to ascertain whether the law is clearly established under *Harlow*." *Id.*, quoting *Powers*, 820 F.2d at 821. At the same time, "[the] court must not expect reasonable government officials to 'recognize the significance of a few scattered cases from disparate areas of the law for a right that is just evolving'." *Id.*, at 1209-10, quoting *Powers*, 820 F.2d at 821. This leads to the 7th Circuit's ultimate conclusion that "public officials are entitled to immunity unless it has been authoritatively decided that certain conduct is forbidden." *Id.*, at 1210, quoting *Alliance to End Repression v. Chicago*, 820 F.2d 873, 875 (7th Cir.1987).

The foregoing rules often contradict each other, such that it seems difficult even for lawyers, much less police officers, to understand the case law, "relate[ ] it to the situation at hand, and mold[ ] their conduct accordingly." Nonetheless, this is the legal construct by which each claim, and the defendants' corresponding conduct, must be judged. Each claim of Supreme Video will be addressed in the order previously outlined on pages 8-9, *supra.*

---

**3.** The question posed, *i.e.*, is there probable cause, highlights the problem discussed in the preceding footnote and no matter how subtle or how obvious it may appear upon review, it is a judicial question, not an executive question. It

involves the type of judgment which judges and magistrates are specifically trained and rightfully allowed to make without fear of suit or liability. It is the same judgment which law enforce-

B. Application to Each Specific Claim.[4]

*1. The defendants seized property they knew or should have known exceeded the scope of the search warrant.*

■ Under the Fourth Amendment, in order to be constitutionally valid, a search warrant must be based on "probable cause" and must "particularly describ[e] ... the things to be seized." U.S.C.A. Amendment 4. When interpreting this language, the Supreme Court has "long recognized that the seizure of films or books on the basis of their content implicates First Amendment concerns not raised by other kinds of seizures." *New York v. P.J. Video, Inc.*, 475 U.S. 868, 873, 106 S.Ct. 1610, 1614, 89 L.Ed.2d 871 (1986). For that reason, "the constitutional requirement that warrants must particularly describe the 'things to be seized' is to be accorded the most scrupulous exactitude when the 'things' are books [or films], and the basis for their seizure is the ideas which they contain." *Stanford v. Texas*, 379 U.S. 476, 485, 85 S.Ct. 506, 511, 13 L.Ed.2d 431 (1965). The underlying purpose is to "make[ ] general searches ... impossible and prevent[ ] the seizure of one thing under a warrant describing another." *Id.*, at 485, 85 S.Ct. at 512. Moreover, as to the requirement for probable cause, while a "higher" standard of probable cause is not required, the warrant request "must be supported by affidavits setting forth specific facts in order that the issuing magistrate may 'focus searchingly on the question of obscenity'." *P.J. Video*, 475 U.S. at 873–75, 106 S.Ct. at 1614. The purpose behind these judicial safeguards is clear: "As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Stanford*, 379 U.S. at 485, 85 S.Ct. at 512.

Supreme Video argues that the defendants' violated these general principles when Detective Schauz seized volumes of the "Wall to Wall" and "Home Movie Productions" movie series which he did not personally review and summarize in his probable cause affidavit. According to Supreme Video, Schauz' affidavit and the underlying warrant only made reference to the specific videos he purchased and reviewed, along with any "copies" of the same, and thus no reasonable police officer could have thought the warrant authorized the seizure of additional "volumes" as opposed to additional "copies". Even if the warrant could be so read, Supreme Video argues that any reasonable police officer should have known that the warrant was invalid, because having not reviewed and summarized the contents of the additional volumes to be seized, Detective Schauz should have known there was no probable cause supporting their seizure.

■ First, under the circumstances, a reasonable police officer could have interpreted the warrant's authorization to seize any "copies of the cassettes Wall to Wall the Way You Like It ... and Home Movie Productions" as authorizing the seizure of additional "volumes" within the two movie series. While the Court agrees with Supreme Video's argument that a standard dictionary definition of the word "copies" refers to duplicate reproductions of a single original, *i.e.*, a single book or a single

---

ment officers are only generally trained to make.

**4.** It is important to note that Chief Thome's only involvement in the activities at issue was in authorizing the underlying investigation and acting as legal custodian of the seized materials. (Defendants' Proposed Findings of Fact at ¶¶ 26–28; Plaintiff's Response to Defendants' Proposed Findings of Fact at ¶¶ 26–28.) Chief Thome did not direct the manner, means, methods or procedures that were followed by Detectives Schauz and Novotny during the investigation, nor did he participate in the execution of the search warrant. (*Id.*) It is well-established that "[a]n individual cannot be held liable in a

§ 1983 action unless he caused or participated in an alleged constitutional deprivation." *Wolf–Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983). "Pursuant to this requirement, courts have rejected § 1983 claims based upon *respondeat superior* theory of liability." *Id.* "Without a showing of direct responsibility for the improper action, liability will not lie against a supervisory official. A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary." *Id.* Thus, regardless of whether the defendants are entitled to qualified immunity, the claims would still have to be dismissed as against Chief Thome in his personal capacity.

videotape, the test here is not how Webster's or American Heritage might define the term, but how a reasonable officer could have defined it under the circumstances. Here, Detective Schauz was confronted with several videotapes that bore the same generic title as the movies referenced in the warrant. While each videotape had a distinct cover and volume number, the warrant did not expressly limit the seizure to particular volumes. Moreover, another portion of the warrant authorized the seizure of certain business records, including "duplicate copies" thereof. The use of the term "duplicate copies" in one section of the warrant, and "copies" in another section, could reasonably imply that, in this specific instance, the word "copies" meant more than just "duplicates". That, of course, may not have been the best interpretation, or even the intended interpretation, but it is certainly a reasonable interpretation and one which should not expose a police officer to personal liability.[5]

■ Second, in order to overcome the qualified immunity defense, Supreme Video must show that the defendants' conduct violated certain constitutional rights that were clearly and particularly established at the time of the seizure. Thus, paraphrasing Supreme Video's argument, Supreme Video must show that, at the time of the seizure, it was clearly established under the law that (1) a search warrant authorizing the seizure of First Amendment materials, in order to be constitutionally valid, must list by title each specific work to be seized; and (2) must be supported by a finding of probable cause as to each specific work, which means each specific work must be personally reviewed by the enforcement officer requesting the warrant and detailed in his probable cause affidavit.

The law is not now and never has been so clearly established. Supreme Video cannot point to a single decision from the U.S. Supreme Court which clearly establishes the proffered proposition. *Marcus v. Search Warrant of Property*, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961), cited by Supreme Video, merely held that a warrant (1) cannot be based on a police officer's conclusory allegation that the items he wants to seize are obscene, and (2) cannot simply authorize an officer, without specific guidelines, to seize anything he deems to be obscene. *Id.*, at 722, 731–32, 81 S.Ct. at 1710, 1715–16. The Court's one-sentence reference to the fact that none of the officers had previously examined any of the publications seized was only cited as additional evidence of the *ad hoc* nature of that particular seizure, and did not clearly establish a general rule applicable to all seizures. *Id.*, at 732, 81 S.Ct. at 1716. Similarly the *Stanford* case, also cited by Supreme Video, simply held that a warrant which authorized the seizure of any materials "concerning the Communist Party" was invalid as a "general warrant"; the Court never discussed whether or not a warrant could allow the seizure of materials that had not been previously reviewed by the officer requesting the warrant. *Stanford*, 379 U.S. at 480, 486, 85 S.Ct. at 509, 512.

Furthermore, the 7th Circuit rejected Supreme Video's argument long before this seizure took place. In *Sequoia Books, Inc. v. McDonald*, 725 F.2d 1091 (7th Cir.1984), *cert. denied*, 469 U.S. 817, 105 S.Ct. 83, 83 L.Ed.2d 31 (1984), the plaintiff filed a § 1983 action for damages arising out of the seizure of several hundred pornograph-

---

5. Defendants also argued at various points in their briefing that the seizure of additional volumes was authorized by other portions of the warrant directing the officers to seize "any other evidence which may constitute a violation of Sec. 944.21, Wis.Stats." and/or items "containing specific reference to or representation of the above-named video cassette tapes...." Neither of these portions of the warrant authorizes the seizure of additional videotapes. It is clearly established that a warrant cannot simply direct the executing officers to seize whatever they deem to be obscene or in violation of a state obscenity statute. *See, Marcus v. Search Warrant of Property*, 367 U.S. 717, 731–32, 81 S.Ct. 1708, 1715–16, 6 L.Ed.2d 1127 (1961); *United States v. Marti*, 421 F.2d 1263, 1268 (2d Cir. 1970). And the language discussing items "containing specific reference to or representation of the above-named video cassette tapes" clearly applied to "records, documents and writings" which referred to the videotapes, and did not authorize the seizure of actual videotapes.

ic magazines, movies and videotapes. Based upon an affidavit detailing the contents of nine (9) magazines which the police had read prior to the seizure, the magistrate issued a warrant authorizing the seizure not only of those specific magazines, but also any other "[m]agazines, movies and video tapes" which contained depictions of various specific sexual activities particularly described in the warrant. *Id.*, at 1093. The plaintiff argued that the warrant was unconstitutional because it left the police with too much discretion as to what items were to be seized. *Id.* The Court disagreed, finding that the warrant's detailed reference to materials containing specific sexual acts was sufficient for constitutional purposes, and further stating that the prior review and specific listing of each item to be seized was impractical and unnecessary:

> Nor would it be feasible to eliminate even this slight possibility by requiring that the warrant name the particular issues of the particular magazines to be seized. The defendant officers would have had to buy every issue of every magazine (and every movie and videotape) that they thought obscene—not just the nine magazines that they described to the magistrate. But their attempts to do so would have aroused [plaintiff's] suspicions, and it would have refused to sell them. Or if the officers had reason to believe that [plaintiff] was warehousing obscene magazines somewhere, under [plaintiff's] view they could not search the warehouse unless they happened to know the names and dates of particular magazines, and those would be the only items they could seize.... The law does not tie law enforcers' hands so tightly.

*Id.*, at 1094.

A similar conclusion was reached in *In re Search of Kitty's East*, 905 F.2d 1367 (10th Cir.1990). In that case, the executing officers had reviewed eighteen (18) videotapes prior to seizure, the contents of which were detailed in a probable cause affidavit submitted in support of a warrant request. *Id.*, at 1372. The affidavit also described the appearance of the videotapes, the loca-

tion of the display case where they were stored, their cost, and the precise definition of the aberrant sexual subjects highlighted in the videos. *Id.* Based on that affidavit, the magistrate issued a warrant authorizing the seizure not only of the 18 videotapes detailed in the affidavit, but also of any other videotapes of similar appearance, proximity and subject matter. *Id.* The owner alleged that the warrant and seizure were unconstitutional on the same grounds alleged here, *i.e.*, seizing videotapes in addition to those specifically reviewed and summarized prior to seizure violates the requirements that "a neutral judicial officer ... focus searchingly on the question of obscenity", and that a warrant must "describe with sufficient particularity the videotapes to be seized...." *Id.* The 10th Circuit rejected both these arguments, stating in pertinent part:

> The officers executing the local warrant were not left to their own devices in determining which videotapes they should seize as obscene and which subjects were most offensive. The local warrant listed eighteen named videotapes and described in detail, though not by name, other seizable videotapes....

> Regarding whether the magistrate was able to focus searchingly enough on the obscenity of the unnamed videotapes, we observe that the magistrate was presented with affidavits describing eighteen videotapes, each of which was deemed by him to be obscene ... We do not think it unreasonable for the magistrate to conclude, based on the descriptions of the eighteen named videotapes, that there was probable cause to believe that other videotapes identical in appearance to those reviewed, available in the same display area, and having the same subject matter, were equally obscene. Although ordinarily it would be preferable to identify the videotapes by name and include in the affidavit descriptions of the specific contents of each videotape, under the circumstances of this case we do not deem the failure to do so constitutionally fatal, particularly given that this was a seizure to secure evidence and not a sei-

zure for the purposes of suppressing or destroying the allegedly obscene material.

*Id.,* at 1373.

Although *Kitty's East* was decided shortly after the seizure at issue here, it cited *Sequoia* as authority for its conclusions, and demonstrates that a reasonable police officer could interpret *Sequoia* and the case law from the Supreme Court as authorizing the seizure of First Amendment materials not previously reviewed and summarized for the issuing magistrate. And clearly, if two federal courts of appeals can reach this general conclusion based upon the case law existing as of 1984 and 1990, it cannot possibly have been unreasonable for Detective Schauz to reach the same conclusion in 1989.[6]

And perhaps more importantly, *Kitty's East* and *Sequoia* both demonstrate that the whole purpose underlying the procedural safeguards relied upon by Supreme Video in this case is to ensure that police officers do not seize First Amendment materials based upon their own *ad hoc,* discretionary, on-the-spot determinations of what is obscene and what is not. Because what was seized in those cases was seized in reliance upon a sufficiently particularized command in the respective warrants, both courts upheld the searches as constitution-

al. What has been overlooked in this case is the fact that Detective Schauz and the other executing officers did not seize additional volumes of the "Wall to Wall" and "Home Movie Productions" movie series based upon an on-the-spot determination that the additional volumes were obscene. Rather, the additional volumes were seized because that is what Detective Schauz thought he was authorized to do in the warrant. We know this from the fact that no videotapes other than those bearing the "Wall to Wall" and "Home Movie Productions" generic titles were seized, and more specifically from the fact that the first thing Detective Schauz said to the store clerk working at the time of the seizure was that he was there to seize all of the "Wall to Wall" and "Home Movie Productions" movies. And again, even if Detective Schauz' interpretation of the warrant and the existing case law were subsequently determined to be incorrect, those interpretations were not unreasonable and did not violate any clearly established constitutional rights at the time of seizure.

### 2. Detective Schauz made material omissions and misrepresentations in his warrant application.

 More problematic in this case is not that Detective Schauz seized videotapes

---

**6.** This is not to say that there is no case law tending to support Supreme Video's proposition. In *United States v. Sherwin,* 572 F.2d 196 (9th Cir.1977), *cert. denied,* 437 U.S. 909, 98 S.Ct. 3101, 57 L.Ed.2d 1140 (1978), the Ninth Circuit overturned obscenity convictions where the underlying search warrant authorized the seizure of a pornographic publication called "Private No. 8" based upon a police officer's affidavit summarizing its contents, and pursuant to that warrant the officer seized not only "Private No. 8", but also "Private No. 7", "Private No. 11", and "Color Climax No. 1", "No. 2", "No. 3" and "No. 4". *Id.,* 572 F.2d at 198–99. The convictions, however, were based only on "Private No. 8", "Color Climax No. 3" and "Color Climax No. 4", and the conviction based upon "Private No. 8" was upheld. *Id.,* at 198–201. The Court never discussed whether convictions based on "Private No. 7" and "Private No. 11" would have been proper. Moreover, the warrant in *Sherwin* made reference to a specific volume; here, the warrant made a general reference to the generic titles of the two movie series and did not refer to specific volumes.

And in *United States v. Guarino,* 729 F.2d 864 (1st Cir.1984), the First Circuit overturned obscenity convictions where the underlying search warrant authorized police officers to seize materials "of the same tenor as" publications entitled "Turkish Delight", "Sex Foto Fiction No. 1" and "Sex Foto Fiction No. 2", which had been attached to the officer's probable cause affidavit. The Court's decision meant that "one cannot ever constitutionally authorize a search for and seizure of items of hardcore pornography that are, as yet, unseen, no matter how concrete or compelling the cause for the search." *Id.,* 729 F.2d at 874 (J. Breyer, dissenting). But this case, along with the *Sherwin* case, constitute at best "a few scattered cases", *Rakovich,* 850 F.2d at 1209–10, from non-authoritative jurisdictions, which appear to conflict with cases from other jurisdictions, including the Seventh Circuit, within which the defendants were operating. Under these circumstances, it cannot be said that the rights at issue here were "clearly established".

which were not specifically listed in the warrant and which he did not review and summarize for Judge Crane prior to seizure, but rather that he never asked for Judge Crane's permission to seize those tapes. As Supreme Video correctly points out, nothing in the record before this Court or before Judge Crane indicates that Judge Crane was ever informed of the fact that "Wall to Wall" and "Home Movie Productions" were the titles of two multi-volume series of movies and not merely the title of two distinct videotapes, or that Judge Crane was ever informed of Detective Schauz' intention to seize videotapes in addition to the tapes summarized in his affidavit. These "omissions" form the basis of Supreme Video's claim that Detective Schauz violated the Fourth Amendment by submitting a sworn warrant application that contained material omissions and misrepresentations.

The cause of action claimed here stems from the U.S. Supreme Court's decision in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In *Franks*, the Court considered the question whether the defendant in a criminal proceeding may ever challenge the veracity of a sworn statement used by the police to obtain a facially valid search warrant. *Id.*, at 155, 98 S.Ct. at 2676. The case involved a probable cause affidavit that referred to statements made by certain witnesses who subsequently denied the statements as being untrue or inaccurate. *Id.*, at 158, 98 S.Ct. at 2677. The Court ruled that the defendant had a right to challenge those statements in a hearing, and that the fruits of the search could be suppressed if the defendant proved that the statements in the affidavit were untrue *and material* to the issuance of the warrant:

> ... we hold that, where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the

event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Id.*, at 155–56, 98 S.Ct. at 2676.

The 7th Circuit interprets *Franks* as applying with equal force in cases where the police "secure a warrant through the intentional or reckless *omission* of material facts", as well as the affirmative misrepresentation of facts. *Olson v. Tyler*, 771 F.2d 277, 281, n. 5 (7th Cir.1985). The Seventh Circuit also acknowledges that, although *Franks* was a criminal suppression case, a *Franks* omission or misrepresentation can give rise to a civil damages cause of action under § 1983. *Id.*, n. 6. In fact, the same legal standard established in *Franks* for the suppression of evidence in a criminal proceeding will apply in determining the question of liability in a civil proceeding under § 1983:

> We believe that the following converse proposition is also true: in cases in which suppression would be warranted because an officer was dishonest or reckless in preparing a warrant affidavit, that officer would not enjoy good faith immunity for civil damages....
>
> We hold therefore that judicial approval of a warrant affidavit cannot serve as an absolute bar to the section 1983 liability of the officer who submitted it. Where the judicial finding of probable cause is based solely on information the officer knew to be false or would have known was false had he not recklessly disregarded the truth, not only does the arrest [or search] violate the fourth amendment, but the officer will not be entitled to good faith immunity.

*Id.*, at 282.

■■■ Based on the foregoing, Detective Schauz cannot be liable under § 1983 for the alleged "omissions" in his warrant affi-

davit unless those same omissions would have required suppression of the fruits of his search in any criminal proceeding that could have been brought against Supreme Video. Under *Franks,* suppression is not warranted unless the misrepresentations at issue were material, *i.e.,* unless probable cause is destroyed by *removing* the misrepresentations at issue from the warrant affidavit. In a "material omissions" case, the question is necessarily reversed, *i.e.,* suppression is not warranted unless probable cause is destroyed by *adding* the omitted information to the warrant affidavit. Thus, Detective Schauz cannot be liable under § 1983 unless it is clearly established under the law that, had he informed Judge Crane of the multi-volume nature of the movie titles referenced in the warrant, and had he informed Judge Crane of his intention to seize videotapes bearing those generic titles which he had not reviewed, probable cause to issue the warrant at issue would have been destroyed.

■ No such showing is made here. As discussed in the preceding section, probable cause does not depend upon whether the police reviewed each and every videotape they intended to seize, but upon whether those which they did review were sufficiently similar to those which they did not review, such that probable cause as to one creates probable cause as to the other. In *Sequoia,* similarity of subject matter was a sufficient basis for probable cause. In *Kitty's East,* similarity of appearance, location and subject matter was a sufficient basis for probable cause. Here, the unreviewed videotapes were merely different volumes in two ongoing series of movies. Had Judge Crane been provided with that information, he could have based probable cause upon the similarity of title, similarity of production company, and similarity of marketing approach common to the various volumes within a single series.

Perhaps the best analogy is to a magazine series, such as Playboy or Penthouse. If such magazines are deemed obscene, the Fourth Amendment would not require the police to review and summarize each monthly volume of the magazine in order for a magistrate to have probable cause to issue a warrant directing the seizure of all monthly volumes that might be located on a given premises at a given time. At least *Sequoia* and *Kitty's East* do not support such a requirement, and Supreme Video has not referred the Court to any case law which clearly and authoritatively does. Absent such clear authority, Detective Schauz' alleged omissions, even if proven, were not material, and thus his actions were not so objectively unreasonable as to expose him to personal liability.

*3. The defendants failed to grant plaintiff a prompt, post-seizure, judicially supervised adversary hearing.*

■ In *Heller v. New York,* 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973), the U.S. Supreme Court held that a judicial officer authorized to issue warrants does not have to conduct a pre-seizure hearing on the issue of probable obscenity before issuing a warrant authorizing the seizure of a pornographic film, where the purpose of the seizure is to preserve the film as evidence in a criminal prosecution. The situation in *Heller* was distinguished from situations where there are large-scale seizures of books or films for the sole purpose of their destruction. *Id.,* at 490–92, 93 S.Ct. at 2793–94. The Court recognized that in the latter case, it has always required a pre-seizure judicial determination of obscenity because such large-scale, destructive seizures constitute "prior" and "final restraint[s] of expression". *Id.* In the former case, however, where there is a relatively small-scale seizure of films for evidentiary purposes, the seizure is valid so long as "following the seizure, a prompt judicial determination of the obscenity issue in an adversary proceeding is available at the request of any interested party...." *Id.,* at 492, 93 S.Ct. at 2795.

Supreme Video argues that its Fourth Amendment rights were violated by the defendants when they allegedly denied Supreme Video's request for a post-seizure *Heller* hearing. The defendants counter that, as mere police officers, they have no power or authority to grant such a hearing. Supreme Video replies that the request was

submitted to Detective Schauz, Chief Thome and District Attorney Paulus, and that if the leading law enforcement officials in Oshkosh could not grant such a hearing, no one could and the seizure was invalid on its face.

The confusion stems from the fact that neither *Heller* nor its limited progeny gives any indication as to what form a plaintiff's request for a *Heller* hearing should take, or as to whom it should be submitted, or regarding who is responsible for providing that hearing once a proper request is made. Supreme Video certainly does not cite any case law which clarifies these issues. *Heller* itself implies that the burden rests on the plaintiff to file the necessary motion with the issuing judge or magistrate:

> A judicial determination of obscenity, following a fully adversary trial, occurred within 48 days of the temporary seizure. *Petitioner made no pretrial motions seeking return of the film* or challenging its seizure, nor did he request expedited judicial consideration of the obscenity issue, so it is entirely possible that a prompt judicial determination of the obscenity issue in an adversary proceeding could have been obtained if petitioner had desired.... In this case, the barrier to a prompt judicial determination of the obscenity issue in an adversary proceeding was not the State, but petitioner's decision to waive pretrial motions and reserve the obscenity issue for trial.

*Id.*, at 490–91, 93 S.Ct. at 2793–94. (Emphasis supplied.)

Supreme Video seems to argue that in cases where no criminal prosecution has been brought, the Chief of Police, in his role as custodian of the seized property, has the obligation to provide a *Heller* hearing. This is incorrect. (Supreme Video

cites no case law supporting this proposition.) Because both the Federal and the Wisconsin criminal rules have procedures in place whereby Supreme Video could have moved a court (in this case the Circuit Court of Winnebago County) for return of the seized films, it was Supreme Video's burden to do so. *See,* Fed.R.Crim.P. 41(e); Wis.Stat. § 968.20.[7] Neither of these procedures requires the commencement of a criminal action. *See e.g., Kitty's East,* 905 F.2d at 1370, n. 1. Because these defendants did not have the responsibility to provide such a hearing, their failure to do so was not unreasonable. Under these circumstances, the defendants are immune from liability.

### 4. The defendants applied for and executed the warrant before Judge Stadtmueller dissolved the injunction issued in Kucharek.

■ Supreme Video argues that the defendants violated its Fourth Amendment rights by obtaining and executing the search warrant at issue before Judge Stadtmueller formally dissolved his injunction against enforcing Wisconsin's obscenity statute. But the *Kucharek* injunction only enjoined certain enforcement activities; it did not create an affirmative right enforceable by Supreme Video. Thus, while defendants' conduct may or may not have been a technical violation of Judge Stadtmueller's Order, it certainly did not rise to the level of a violation of Supreme Video's Fourth Amendment rights. By the time the warrant was obtained and executed, the 7th Circuit had reversed Judge Stadtmueller and the U.S. Supreme Court had denied further review. Any questions concerning the constitutionality of the obscenity statute, and any search executed to

---

**7.** 968.20. Return of property seized. (1) Any person claiming the right to possession of property seized pursuant to a search warrant or seized without a search warrant may apply for its return to the circuit court for the county in which the property was seized or where the search warrant was returned. The court shall order such notice as it deems adequate to be given the district attorney and all persons who have or may have an interest in the property and shall hold a hearing to hear all claims to its true ownership. If the right to possession is proved to the court's satisfaction, it shall order the property, other than contraband or property covered under sub. (1m) or s. 951.165, returned if:

(a) The property is not needed as evidence or, if needed, satisfactory arrangements can be made for its return for subsequent use as evidence; or

(b) All proceedings in which it might be required have been completed.

enforce the same, had been resolved. The only issue left is whether enforcement could begin prior to the formal dissolution by Judge Stadtmueller of the Order, and that issue triggers procedural and administrative concerns, not Supreme Video's constitutional rights.

■ Even if such conduct were somehow violative of Supreme Video's rights, the actions of the Defendants were not objectively unreasonable. Detective Schauz, aware of Judge Stadtmueller's prior order, inquired as to whether the statute was constitutional and could be enforced. District Attorney Paulus assured him that the U.S. Supreme Court had upheld the statute's constitutionality and therefore could be enforced. All that was left was the ministerial duty of dissolving the order. At that point, it was objectively reasonable for Detective Schauz to assume either (1) that he could go forward on the basis of Paulus' advice, coupled with the decisions by the 7th Circuit and the Supreme Court, or (2) that dissolution had already taken place, especially considering that the warrant was obtained and executed roughly three months after the Supreme Court had denied certiorari. Certainly Supreme Video has not cited any statutory or case law that clearly establishes the contrary. The plaintiff having failed to meet that burden, the defendants are immune from liability.

*5. The defendants did not request or allow the judge to examine the allegedly obscene pictures or passages within the context which they appear.*

■ Supreme Video makes the general allegation in its Amended Complaint that the defendants did not request or allow the judge to examine the allegedly obscene pictures or passages contained in these films within the context of the work in which they appear. (Amended Compl. at ¶ 501(B).) This issue is not addressed in Supreme Video's briefs and it is difficult to ascertain exactly what is meant by the claim. There is no case law "clearly establishing" that pornographic portions of a movie or magazine must be described within the context of the whole work. To the contrary, the U.S. Supreme Court "ha[s] never held that a magistrate must personally view allegedly obscene films prior to issuing a warrant authorizing their seizure." *P.J. Video,* 475 U.S. at 874, n. 5, 106 S.Ct. at 1614, n. 5. All that is required is "a reasonably specific affidavit describing the content of a film...." *Id.* That requirement was certainly met here. The affidavit submitted by Detective Schauz provided a scene-by-scene summary of the various sexual activities taking place in each movie. The affidavit was *reasonably* specific, with detailed descriptions of various sexual acts. The affidavit was at least as specific as affidavits previously upheld by the Supreme Court. *See, e.g., P.J. Video,* 475 U.S. at 878–884, 106 S.Ct. at 1616–19. Accordingly, this claim must also be dismissed.

*6. The defendants seized all copies of the videotapes, not just the minimum needed for evidentiary purposes.*

*7. The defendants' actions constitute an unlawful prior restraint upon free expression.*

■ These claims arise from essentially the same conduct and thus will be treated together. Supreme Video claims that its First and Fourth Amendment rights were violated when the defendants executed a search warrant that allowed for the seizure of *all* copies of the videotapes at issue, as opposed to the minimum amount necessary for evidentiary purposes. Supreme Video also claims that allowing the seizure of *all* copies of the videotapes, combined with defendants' failure to provide the prompt, post-seizure *Heller* hearing discussed in section 3, *supra,* imposed an unlawful prior restraint upon free expression and violated Supreme Video's First Amendment rights.

These claims have little merit. First, nothing in the factual record before the Court establishes or even asserts that the defendants seized every copy of the videotapes that were seized. Supreme Video points out that the warrant *allowed* the seizure of every copy, and that the executing officers *intended* to seize every copy, but nowhere in the Complaint, or in Supreme Video's affidavits, or in the Pro-

posed Findings of Fact, is it ever asserted that the defendants *actually seized* all of the available copies of these videotapes. Absent that showing, both claims must fail.

Second, even if all available copies of the videotapes were seized, the remedy available to Supreme Video was to move or petition a court of competent jurisdiction to order the defendants to copy the films so that their commercial use could be continued pending a judicial determination of the obscenity issue. *Heller*, 413 U.S. at 492–93, 93 S.Ct. at 2794–95. If prompt copying was denied, then the films were to be returned. *Id.*, at 493 and n. 11, 93 S.Ct. at 2795 and n. 11. Here, Supreme Video made such requests directly to the defendants (the wrong approach), and although copying was denied, all duplicate copies were returned to Supreme Video. The duplicates were not returned until July 2 and August 6, 1991 (roughly 3 and 4 months after the seizure at issue), but Supreme Video has not cited any case law clearly establishing that such a delay was objectively unreasonable. Indeed, Supreme Video shares a large part of the blame for the delay, due to its failure to file a motion with the Circuit Court, pursuant to Wis. Stat. § 968.20, for the return of any seized materials not required for evidentiary purposes. See section 3, *supra*. As the Supreme Court stated in *Heller*, "[a]lthough we have refrained from establishing rigid, specific time deadlines in proceedings involving seizure of allegedly obscene material, we have definitely excluded from any consideration of 'promptness' those delays caused by the choice of the defendant." *Heller*, 413 U.S. at 490, 93 S.Ct. at 2794.

Given the foregoing, and the fact that the defendants cannot be held liable for the alleged failure to provide a *Heller* hearing (See section 3, *supra* ), the combination of that alleged misconduct also did not impose a "prior restraint" in violation of the First Amendment. Accordingly, both claims must be dismissed.

*8. The defendants executed the warrant without first obtaining permission from the State Attorney General.*

■ Wisconsin's obscenity statute provides that "[n]o civil or criminal proceeding under this section may be commenced against any person for a violation of sub. (3) or (4) unless the attorney general determines under s. 165.25(3m) that the proceeding may be commenced." Wis.Stat. § 944.-21(7). Supreme Video argues that the word "proceeding" in the foregoing language includes the execution of a search warrant, and thus the defendants violated the Fourth Amendment and state law by failing to get permission from the State Attorney General prior to executing the warrant at issue. Defendants argue that "proceeding" refers only to the actual commencement of a criminal or civil case, and thus permission is not required for the mere execution of a search warrant. The Defendants' interpretation is not only a reasonable interpretation, but the better interpretation. Even so, liability does not turn upon which interpretation is correct, but upon whether the defendants' interpretation was objectively reasonable under the law existing at the time of the seizure. Clearly it was. To date, no court has interpreted the scope of the word "proceeding" for purposes of determining what enforcement activities require prior permission from the Attorney General. Thus, the Defendant's interpretation does not expose them to personal liability.

## II. MUNICIPAL LIABILITY

■ Supreme Video concedes that it is not seeking compensatory or punitive damages from the City of Oshkosh by virtue of the actions taken by the defendants in their official capacities. Supreme Video seeks only prospective, injunctive relief against the City, *i.e.*, enjoining the City from future seizures without providing the *Heller* hearing discussed in section 3, *supra,* and requiring the City to return the seized materials. The parties focus on the issue whether Supreme Video must first show that the retention of the seized materials and the failure to provide a *Heller* hearing was the result of a "municipal policy or custom" before such claims can be brought against the City. But the Court need not

address this issue. As discussed in section 3, *supra,* there is no authority for the proposition that the City, through its police department, is the division of government responsible for providing the required post-seizure *Heller* hearing. Rather, it is Supreme Video's responsibility to file the proper motion with the Circuit Court requesting return of the seized property pursuant to Wis.Stat. § 968.20. Given that these procedures are in place and have been available to Supreme Video throughout this litigation, there is no basis for granting the requested injunctive relief. These claims must also be dismissed.

Therefore, it is hereby ordered that Plaintiff's motion requesting partial summary judgment is denied and Defendants' summary judgment motion requesting dismissal of all of Plaintiff's claims is granted.

SO ORDERED.